No. 60,808
and
No. 61,249

Southwest Kansas Royalty Owners Association, *Appellees,* and Kansas Power & Light, Co., *et al., Appellants,* v. The State Corporation Commission of the State of Kansas, *et al., Appellees.*

(769 P.2d 1)

Opinion filed January 20, 1989.

*Martin J. Bregman,* general counsel, of Topeka, argued the cause and *John K. Rosenberg,* assistant general counsel, of Topeka, was with him on the brief for appellant Kansas Power & Light Co.

*Mark H. Adams, II,* of Adams and McCarthy, of Wichita, argued the cause and *Jane G. Alseth,* of Omaha, Nebraska, was with him on the briefs for appellant Northern Natural Gas Company, and *J. D. Steelman,* of Tulsa, Oklahoma, was with him on the briefs for appellant Williams Natural Gas Company.

*Jack Glaves,* of Law Offices of Jack Glaves, of Wichita, argued the cause and *D. J. McCarthy,* of the same firm and *Clarence A. Conoley,* assistant general counsel, of Kansas City, Missouri, were with him on the briefs for appellant Panhandle Eastern Pipe Line Company.

*Shari M. Feist,* assistant general counsel, argued the cause and *Frank A. Caro, Jr.,* general counsel, was with her on the brief for appellee Kansas Corporation Commission.

*Gregory J. Stucky* and *Dale M. Stucky,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, and *B. E. Nordling,* of Kramer, Nordling, Nordling & Tate, of Hugoton, were on the brief for appellee Southwest Kansas Royalty Owners Association.

*Charles H. DuBois,* of Mobil Oil Corporation, of Denver, Colorado, *Buck Sanders,* of Anadarko Petroleum Corporation, of Houston, Texas, and *Jerome E. Jones,* and *Patricia A. Gorham,* of Hershberger, Patterson, Jones & Roth, of Wichita, were on the brief for appellees Mobil Oil Corporation and Anadarko Petroleum Corporation.

*Spencer L. Depew* and *David W. Nickel,* of Depew Gillen & Rathbun, of Wichita, were on the brief for intervenor/appellee Santa Fe Minerals.

*Richard C. Byrd,* of Anderson, Byrd & Richeson, of Ottawa, argued the cause and *James G. Flaherty,* of the same firm, and *Lin Patterson,* of Houston, Texas, were with him on the brief for intervenor/appellee Mesa Limited Partnership, and *James G. Flaherty,* of the same firm, and *J. A. Hannah,* of Oklahoma City, Oklahoma, were with him on the brief for intervenor/appellee Tenneco Oil Company.

*Steven D. Gough,* of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and *Stephen F. Gates* and *David E. Brody,* of Denver, Colorado, were with him on the brief for intervenor/appellee Amoco Production Company.

*Stanford J. Smith,* of Robbins, Tinker, Smith & Metzger, of Wichita, argued the cause and *Stanford J. Smith, Jr.,* of the same firm, and *John C. Lovett,* of Tulsa, Oklahoma, were with him on the brief for intervenor/appellee Cities Service Oil and Gas Corporation.

The opinion of the court was delivered by

HERD, J: This is an appeal from the district court's order affirming the order of the Kansas Corporation Commission (Commission) amending the Basic Proration Order (B.P.O.) for the Kansas Hugoton Gas Field to allow infill drilling. The appeal of Williams Natural Gas Company (Williams) and Northern Natural Gas Company (Northern) has been consolidated with that of Panhandle Eastern Pipeline Company (Panhandle) and Kansas Power & Light Company (K.P.L.). Appellant Williams was formerly Northwest Central Pipeline Corporation, and Gas Service Company, an intervenor, has merged into K.P.L.

Appellees Mobil Oil Corporation (Mobil), Anadarko Petroleum Corporation (Anadarko), Santa Fe Minerals, Southwest Kansas Royalty Owners Association (Southwest), Mesa Operating Limited Partnership (Mesa), Tenneco Oil Company (Tenneco), Amoco Production Company (Amoco), and Cities Service Oil & Gas Corporation (Cities Service) join the Commission as proponents of its order.

The facts concerning the Hugoton Field are well known, having been recited in innumerable cases dealing with commission regulation but for ready reference we repeat them here. The Hugoton Field is the largest known reservoir of natural gas in the world. *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, 4, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964). It extends south from Kansas into Oklahoma and Texas. The Kansas portion of the field was discovered in 1922 and covers over two and one-half million acres. Approximately 90% of the gas produced from the Kansas Hugoton Gas Field is commingled in integrated pipeline systems with gas produced from various other states and distributed throughout many parts of the country. See *Colorado Interstate Gas Co.,* 192 Kan. at 4-7. The purchase and sale of such gas is subject to regulation as interstate commerce by the Federal Energy Regulatory Commission (FERC), under the Natural Gas Policy Act (N.G.P.A.) of 1938, 15 U.S.C. § 3301 *et seq.* (1982). *Northern Gas Co. v. Kansas Comm'n.,* 372 U.S. 84, 9 L. Ed. 2d 601, 83 S. Ct. 646 (1963).

The Commission first exercised its jurisdiction over the Kansas Hugoton Field on March 21, 1944, when it issued the B.P.O. pursuant to G.S. 1935, 55-701 *et seq.,* finding the field was a

common source of supply. See *Colorado Interstate Gas Co.*, 192 Kan. at 6. The purpose of the B.P.O. is to ensure orderly development of the field by prescribing regulations for the production of gas from the field. The B.P.O. attempts to ensure that each owner will recover, without waste, that amount of gas underlying his or her land. The Commission retains jurisdiction over the field for the purpose of issuing further orders as necessary. The B.P.O. has been amended many times since it was first issued, as additional geological and engineering information has been gained by development of the field.

This case began on July 31, 1984, when Cities Service, an owner and operator of approximately 500 wells, or about 12.5% of the leasehold interests in the Kansas Hugoton Field, filed an application with the Commission to amend the B.P.O. to allow an optional infill well (an additional well) on each Basic Proration Unit (B.P.U.) of 480 acres or more in the Kansas Hugoton Field. The infill application was filed pursuant to the Kansas conservation statutes, K.S.A. 1987 Supp. 55-703 and K.S.A. 55-703a. Cities Service alleged the latest engineering and geological evidence demonstrated that the one well allowed in each B.P.U., as originally established in the B.P.O., was insufficient to effectively and efficiently drain the unit. A B.P.U. is that acreage attributed to a well for the purpose of assigning production limits (well allowables) as established by the B.P.O. It generally consists of 640 acres, but may be larger or smaller, in which case its allowable is adjusted based on the ratio of the unit's acreage to 640 acres. Production from the field is regulated by the Commission pursuant to K.S.A. 1987 Supp. 55-703 through semi-annual determinations based upon market demand.

The Commission has historically allowed only one well to each B.P.U. because it found one well sufficient to adequately drain the unit. Cities Service asked that the proration formula be modified so that one-half the acreage in each B.P.U. over 480 acres be attributed to the existing well and one-half to the infill well. Cities Service alleges the field is so heterogeneous in lithology and permeability that a significant volume of gas is trapped within pods which are not efficiently drained by existing wells. Cities Service alleges infill drilling is necessary immediately because pressures are declining to the point where some gas will never be recovered if not produced in the near future.

Williams, Northern, Panhandle, and K.P.L. intervened in opposition to the application. K.P.L. is a natural gas public utility which purchases a large amount of its gas from the Kansas Hugoton Field, both directly from producers and indirectly as part of its purchases from interstate pipelines. Williams, Northern, and Panhandle are interstate pipelines which purchase and transport natural gas from the Kansas Hugoton Field and sell the gas in both intrastate and interstate markets.

The administrative procedure in this case was extensive. From the date of Cities Services' filing to February 15, 1985, all parties to this appeal participated in numerous prehearing proceedings before the Commission involving matters of timing, procedure, issues, and the prefiling of testimony. These hearings required briefing and oral argument. Between February 15, 1985, and July 15, 1985, direct and rebuttal testimony was prefiled with the Commission. During the same time discovery was conducted.

The Commission hearing began on July 29, 1985, and continued until December 5, 1985, with 52 days of testimony and oral argument. The transcribed record of the hearing contains 12,000 pages, not including the prefiled testimony, and required fifty volumes to transcribe. There were numerous exhibits introduced representing the work and testimony of sixty expert witnesses. The amount of evidence presented in the prefiled testimony and at the hearings is said to be unprecedented in conservation hearings before the Commission.

On April 24, 1986, the Commission issued its order amending the B.P.O. to allow the drilling of a second well on each B.P.U. containing 480 acres or more. The Commission found:

"[T]he geological evidence establishes the Kansas Hugoton Gas Field is a heterogeneous, discontinuous reservoir. The depositional characteristics are so variable that permeability, porosity, and reservoir quality change significantly over distances of less than one mile and occur throughout the entire field. Permeability barriers, *i.e.*, where permeability is so low that movement of gas is reduced to an extremely slow rate or is stopped completely, exist in the formation or zones within the individual proration units throughout the field, thereby restricting the vertical and lateral flow of gas. This results in isolated discontinuous productive zones in the field which are not in pressure communication with the existing well and are not being effectively or efficiently drained by the existing well on the proration unit. Furthermore, a significant portion of the productive intervals within each proration unit, although in pressure communication with the existing well, consists of poor, low permeability reservoir rock which prevents one well from effectively or efficiently draining the proration

unit. To the end of preventing waste, an infill well on each basic proration unit of 480 acres or more within the field is necessary to effectively and efficiently drain portions of the reservoir on each proration unit in the field which cannot be effectively and efficiently drained by the existing well on said proration unit."

The Commission further found that the engineering evidence confirmed the geological evidence.

On May 15, 1986, the Commission granted a rehearing. Williams then filed two petitions for judicial review which were decided in *Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n,* 241 Kan. 165, 735 P.2d 241 (1987).

On July 18, 1986, the Commission issued its order on rehearing, affirming its amendment to the B.P.O. with regard to the drilling of an optional infill well on each B.P.U. of 480 acres or more, but modifying the April order in some respects. The Commission decided the fixed locations adopted in the April order were to be amended to permit flexible location of the infill wells. The Commission also modified the means of assigning allowables and certain other matters. The July order incorporated all findings of fact and conclusions of law made in the April order which were not inconsistent with the July order. Motions for further rehearing were denied.

The final order resulted in the assignment of allowables to both the existing well and the infill well without altering the boundaries of the existing B.P.U.. The new formula divides the B.P.U. acreage factor between the original and the infill well and provides that each well shall be separately metered and accumulate overage and underage based on its own production status.

The Commission determined the localized studies of approximately 100 wells were sufficient to make a projection from which it issued a field-wide order. It reasoned the only alternative to a field-wide projection would be to conduct an exhaustive individual hearing on each B.P.U., which would be time-consuming and impracticable, as well as extending beyond the burden of proof necessary to sustain Cities Service's application.

The Commission determined an additional well on each B.P.U. would permit the recovery of between three and one-half to five trillion cubic feet (Tcf) of natural gas which would be wasted without an infill drilling program. The recovery of three Tcf of gas would be equivalent to more than 10 years of production from the field at current rates. It was estimated that such a

quantity of gas would satisfy all of K.P.L.'s requirements through the year 2050.

The Commission found an additional well on each B.P.U. necessary for effective and efficient drainage to prevent waste and protect correlative rights pursuant to K.S.A. 1987 Supp. 55-703(a). It found the recovery of these additional reserves would also fulfill the statutory objective of permitting producers "to ultimately produce approximately the amount of gas underlying the developed lease," and that consumers would benefit from the availability of the additional reserves. To the end of satisfying estimated future market demand, the Commission's order permitted some drilling to commence January 1, 1987, with additional drilling spread over a four-year period.

On July 18, 1986, Southwest petitioned for review in the district court despite having intervened in support of Cities Service's application—thus, the misleading caption of this case. Southwest objected to the Commission's four-year timetable which delayed drilling.

Southwest is a voluntary association of mineral owners and oil and gas lessors in the Kansas Hugoton Field. Southwest has been in existence since 1948 and includes members from each of the Kansas counties in which the field is located. Southwest supports infill drilling as a furtherance of its members' interests. It has now dropped its objection to the amended B.P.O. and joins appellees in support thereof.

Appellants herein cross-appealed from Southwest's petition, and on March 19, 1988, the district court affirmed the Commission's orders. It denied motions for a new trial or to amend judgment after oral argument on the motions. This appeal followed.

## I. THE SCOPE OF JUDICIAL REVIEW

Let us first consider the scope of judicial review of a Commission order. The responsibility of this court is to determine if the district court reviewed the Commission's orders in accordance with its statutory responsibility. *Shawnee Mission Med. Center v. Kansas Dept. of Health & Environment*, 235 Kan. 983, 989, 685 P.2d 880 (1984). Under the Act for Judicial Review of Agency Actions, the party seeking change of an order has the burden of showing the district court that an agency's order is invalid for one of the following reasons:

"1. The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"2. the agency has acted beyond the jurisdiction conferred by any provision of law;

"3. the agency has not decided an issue requiring resolution;

"4. the agency has erroneously interpreted or applied the law;

"5. the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"6. the persons taking the agency action were improperly constituted as a decisionmaking body or subject to disqualification;

"7. the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"8. the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

In determining whether the agency action is invalid for one of the foregoing reasons, the reviewing court must take into account the rule of harmless error. K.S.A. 77-621(d). Appellants contend the Commission has violated items numbers (2), (5), (7), and (8). Whether the Commission has violated number (7) is in issue in several different findings by the Commission.

Neither the district court nor an appellate court may substitute its judgment for that of the administrative agency. *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 673 P.2d 1126 (1983). So long as the record contains competent evidence in support of the decision of the Commission, its decision is reasonable and must be upheld by this court. *Kansas Transport Co., Inc. v. State Corporation Commission*, 202 Kan. 103, 446 P.2d 766 (1968). The Commission is vested with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission*, 221 Kan. 505, 561 P.2d 779 (1977). The Commission is presumed to act fairly, reasonably, and impartially. *Cain v. Kansas Corporation Commission*, 9 Kan. App. 2d 100, 673 P.2d 451 (1983), *rev. denied* 235 Kan. 1041 (1984).

However, the Commission is required to provide in its orders the basis for its decisions. *Central Kansas Power Co. v. State Corporation Commission*, 181 Kan. 817, 316 P.2d 277 (1957); K.A.R. 82-1-232(a)(3). The lack of express findings of the basic evidentiary facts underlying the decision will not be supplied by implication and "courts will not search the record in order to

ascertain whether there is evidence from which the ultimate finding could be made." *Kansas Public Service Co. v. State Corporation Commission,* 199 Kan. 736, 744, 433 P.2d 572 (1967).

It is *not* necessary, however, for the Commission to "state just what weight it gives each factor covered by the evidence. . . . [I]t is for the Commission to determine the weight it shall be given, not the courts." *Colorado Interstate Gas Co.,* 192 Kan. at 21. "Nothing can be gained by making a comparison of conflicting testimony. The commission is the trier of facts. The commission had the expertise through its staff to sift and evaluate . . . conflicting testimony." *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 679, 482 P.2d 1 (1971).

The Commission is empowered to prevent waste, avoid uncompensated drainage, and assure orderly development and production of natural gas in Kansas. K.S.A. 55-701, -702. Prevention of waste is the primary purpose of the gas conservation laws. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 169 Kan. 722, 732, 222 P.2d 704 (1950), *reh. denied* 170 Kan. 341, 225 P.2d 1054 (1951). "Waste" is defined as including economic, underground, or surface waste. K.S.A. 55-702. K.S.A. 55-701 prohibits waste not only in the production of gas, "but for such *purposes* as would constitute waste." 169 Kan. at 732. (Emphasis supplied.)

## II. DISTRICT COURT ACTION

(1) The first issue under this title is whether the district court erred in failing to make separate and distinct findings on each material issue.

The district court is required under K.S.A. 77-621(b) and K.S.A. 60-252 to weigh the evidence from the record in order to make a separate and distinct ruling on each material issue on which its decision is based. See *Colorado Interstate Gas Co.,* 192 Kan. at 17. The district court made the following findings:

"The Court, after a review of the record, the briefs filed herein, and hearing arguments of all counsel, being fully advised in the premises finds:

"1. Pursuant to Journal Entry filed October 10, 1986, it was established that this Court pursuant to Chapter 55 of the Kansas Statutes Annotated has jurisdiction to review the State Corporation Commission of the State of Kansas orders of April 24 and July 18, 1986, issued in Docket C-164; that the orders sought to be reviewed are effective in Stevens County, Kansas; and, that venue for judicial review of the orders exists in Stevens County, Kansas.

"2. The Commission's action, and the statutes, rules and regulations governing their action, was constitutional.

"3. The Commission's acts were within the jurisdiction conferred by law.

"4. The Commission resolved all issues requiring resolution.

"5. The law was correctly interpreted and applied by the Commission.

"6. Lawful procedures were followed.

"7. Substantial evidence supports the Commission's findings of fact.

"8. The Commission's actions were not unreasonable, arbitrary or capricious.

"9. The burden of proving the invalidity of agency action is on the party asserting invalidity, and no such showing has been made in this case.

. . . .

"IT IS FURTHER CONSIDERED, ORDERED AND DECREED that the findings of fact and conclusions of law expressed in the Orders of the Kansas Corporation Commission dated April 24, 1986 and July 18, 1986 are hereby adopted as the Court's findings of facts and conclusions of law."

Appellants argue this judgment gives no indication whether the district court actually considered the evidence independently, or, if it did, how it measured the evidence. Appellants therefore ask that a Special Master be appointed to make specific factual findings as in *Colorado Interstate Gas Co.*, 192 Kan. at 4, if the case is not remanded for specific findings. A special master was required in *Colorado Interstate Gas Co.* only because the district court refused to give the findings of fact and conclusions of law which supported its decision to *overrule* the Commission's findings and conclusions.

It is well accepted that the reviewing court has the discretion to adopt Commission findings as its own and is only required to give specific findings where it overrules Commission findings. In *Colorado Interstate Gas Co.*, 192 Kan. at 17, we held the reviewing court must make its own findings "*if* the reviewing court does not adopt the findings of fact and conclusions of law of the Commission." (Emphasis supplied.) Here, the district court adopted the Commission findings; therefore, it need not make its own detailed findings. This issue is without merit.

(2) The second issue regarding district court action is whether that court should have permitted the introduction of newly discovered evidence. Appellant Williams claims newly discovered evidence concerning market demand shows the Commission erred in concluding infill drilling should not be delayed until January 1, 1989, but should instead begin January 1, 1987.

The Commission's staff recommended that the four-year phase-in for infill drilling not begin until January 1, 1989, based

on its estimation there would be no market demand for additional production until 1993. The Commission rejected its staff's proposal, finding its estimates undervalued.

K.S.A. 77-619 allows the court to receive additional evidence on review of any agency action. The decision is, however, discretionary with the court. The district court found the Commission's findings to be supported by substantial competent evidence. These findings included the Commission's determination that infill drilling in 1987 was to be allowed in the interests of preventing *waste,* and not just because of market demand. Prevention of waste is the Commission's primary responsibility. Williams did not meet its burden of showing the district court abused its discretion. Abuse of discretion is defined as arbitrary or unreasonable judicial action, such that no reasonable person could disagree as to its impropriety. *Stayton v. Stayton,* 211 Kan. 560, 562, 506 P.2d 1172 (1973). We find no abuse of discretion by the district court.

### III. JURISDICTION

(1) We next turn to multiple jurisdictional issues. The first is whether appellants are correct in their claim that the Commission lacked subject matter jurisdiction because the evidence of lack of permeability is inconsistent with the Commission's finding that the Kansas Hugoton Gas Field is a common source of supply.

The challenged finding provides:

"7. Regarding the Commission's authority to prorate two separate reservoirs by one order, the Commission agrees with NWC, Northern and KPL that it cannot regulate in such a manner. However, contrary to what some parties may interpret the April 24, 1986, order to imply, the Commission considers the Hugoton Chase Group to be one common source of supply despite the heterogeneity and discontinuities found to exist in the field. At page 6, paragraph 7 of the April 24, 1986, order, the Commission notes that the field is a common source of supply. Nonetheless, the April 24, 1986, order should be further modified to expressly provide that none of the evidence presented in this docket has changed the Commission's long standing finding that the Chase Group of the Hugoton Reservoir is a single common source of supply."

Appellants contend the Commission was arbitrary and unreasonable in finding the field a common source of supply after finding the field is permeated with barriers to the horizontal flow of natural gas requiring infill wells for proper drainage of the field. They argue there is less evidence in the case at bar than there was in *Zinke & Trumbo, Ltd. v. Kansas Corporation*

*Comm'n,* 242 Kan. 470, 749 P.2d 21 (1988), that the entire field is a common source of supply.

Inconsistency within an administrative decision may render it arbitrary. *Coggins v. Public Employee Relations Board,* 2 Kan. App. 2d 416, 420-21, 581 P.2d 817, *rev. denied* 225 Kan. 843 (1978). Appellants note Justice Fatzer's dissent in *Class I Rail Carriers v. State Corporation Commission,* 191 Kan. 201, 216-17, 380 P.2d 396 (1963), in which he would have reversed on the ground the Commission's basic findings of fact were "wholly inconsistent" with its ultimate conclusion.

K.S.A. 55-702 provides, without definition, that the term "common source of supply" shall include "that portion lying within this state of any gas reservoir lying partly within and partly without this state." K.A.R. 82-3-101(a)(14) (1987 Supp.) provides: " 'Common source of supply' means each geographic area or horizon definitely separated from any other area or horizon which contains, or appears to contain, a common accumulation of oil, gas or both."

Appellants argue that a "common source of supply" cannot include zones with permeability barriers so complete that they completely stop the movement of gas into other areas deemed part of the common source.

Appellants note the term "reservoir" used in K.S.A. 55-702 is defined by the Natural Gas Policy Act, 15 U.S.C. § 3301(6) (1982), as: "Any producible natural accumulation of natural gas, crude oil, or both, confined (A) by impermeable rock or water barriers and characterized by a single natural pressure system; or (B) by lithologic or structural barriers which prevent pressure communication."

They next contend K.A.R. 82-3-101 (1987 Supp.) is erroneous if read to exclude the concept of pressure communication. This is because K.S.A. 1987 Supp. 55-703(a) gives the Commission authority to regulate *developed* leases, while that portion of a unit overlying an area of trapped gas must be accounted for as undeveloped.

Appellants finally note the Commission employs the definition of "pool" contained in K.S.A. 1987 Supp. 79-4217(4) for severance tax exemption, which definition shows the greatest inconsistency in the Commission's holdings. A "pool" is defined as "an underground accumulation of oil or gas in a single and

separate natural reservoir characterized by a single pressure system so that production from one part of the pool affects the reservoir pressure throughout its extent." K.A.R. 82-3-101(a)(47) (1986 Supp.) (since amended) defined "pool" as "a common source of supply as officially named."

We agree that a reservoir completely isolated from other reservoirs may not be held within the same common source of supply. Our examination of the record, however, reveals there was adequate substantial competent evidence to support the finding of the Commission that the Kansas Hugoton Field is a common source of supply.

The Commission has always acknowledged that the Hugoton Field consists of multiple horizons. See *Colorado Interstate Gas Co. v. State Corporation Commission,* 192 Kan. 1, 4, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964). Prior to its latest amendment, paragraph (c) of the B.P.O. stated, "[T]he number of gas-producing horizons varies between wells and tracts, most of them containing from three to five gas-producing zones." These horizons have been consistently regulated by the Commission as a common source of supply for over 40 years without challenge. Cities Service simply brings additional data which explains that the reservoir is heterogeneous to an extent that one well per B.P.U. cannot always be expected to drain the unit within an economically reasonable time.

Testimony explained that the pools in the field are not separate reservoirs because they are part of the same geological series of gas that moved into the area at one time and, over geological time, the gas would move as part of the same reservoir system. A witness for appellants testified that, over geological time, one well could theoretically drain the entire field.

It is evident from reading the Commission's orders as a whole that its language in finding that the movement of gas is "stopped completely" in some instances by barriers throughout the field is based upon the period of time within which the production of gas would be of benefit to society as distinguished from geological time. Appellants' evidence shows that, over time, the gas may be predicted to move as part of the same reservoir system. In later arguments on different issues, appellants acknowledge the evidence shows the gas is not completely trapped. We agree.

This is not a case as in *Zinke & Trumbo,* 242 Kan. 470, where

the Commission failed to make a finding that the area covered by its order was ·one common source of supply. Nor is it similar to *Zinke & Trumbo* in the evidence supporting the Commission's jurisdiction. In *Zinke & Trumbo*, the Commission simply stated that the Morrow sand underlying the entire acreage involved in the dispute would be governed by its order. There was no evidence that Morrow sand within a geographical area could not cover different common sources of supply; on the contrary, the evidence was that it does. Further, the order went on to encompass land which has no Morrow sand.

We find substantial competent evidence supports the Commission's finding that the Kansas Hugoton Field is a common source of supply. Findings which may be construed to the contrary are granted the "escape clause" provided by the legislature for administrative bodies under the harmless error rule, K.S.A. 77-621(d). *Zinke & Trumbo*, 242 Kan. at 475. "Agency action will not be upset because of harmless error." *In re Certif. of Need App. by Community Psychiatric Centers, Inc.*, 234 Kan. 802, 805, 676 P.2d 107 (1984). We thus hold the Commission had subject matter jurisdiction of Cities Service's application.

(2) The next jurisdictional issue is whether the Commission lacks in personam jurisdiction of the parties because notice was not personally served on all royalty owners. The constitutional test of adequate notice is one of reasonableness. *Mathews v. Eldridge*, 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976); *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 94 L. Ed. 865, 70 S. Ct. 652 (1950); Ryan, Kansas Administrative Law with Federal References, Ch. 9, p. 15 (2d ed. 1985) (citing *Rydd v. State Board of Health*, 202 Kan. 721, 451 P.2d 239 [1969]). Appellants claim this deficiency violates the constitutional standards of due process and the Commission's regulations. They argue that, although the proceedings before the Commission were initiated as a rule-making procedure, they become adjudicatory in nature, requiring due process. The right under due process to personal service as well as publication notice when the whereabouts of the parties is easily obtainable applies to administrative proceedings which are quasi-judicial in nature and which adversely affect the parties' rights. *Neeley v. Board of Trustees, Policemen's & Firemen's Retirement System*, 205 Kan. 780, 473 P.2d 72 (1970).

K.A.R. 82-3-135(c)(3) (1987 Supp.) provides:

"The person who initiated the proceeding shall provide any additional notice required by any rule, regulation or statute which applies to the hearing or is necessary to provide due process to any person whose property may be affected by the hearing."

Cities Service therefore made personal service by mail on the royalty owners of Cities Service, on some 137 operators of wells, and on all 10 of the pipeline purchasers in the field. Cities Service also caused a notice of hearing to be published in a local newspaper in each of the eleven counties in the Kansas Hugoton Field and also in the Wichita Eagle-Beacon.

The Commission found notice was proper and that it had jurisdiction of all necessary parties. However, in its April order, it mistakenly found that notice was mailed to *all* royalty owners, rather than just those of Cities Service.

Appellants contend notice to the over 10,000 royalty owners besides Cities Service's was necessary in order to comport with due process and the mandate of K.A.R. 82-3-135(c)(3) (1987 Supp.) that notice be served to any person whose property may be affected by the hearing. Appellants contend these owners had a property interest in the proceedings, and their names and addresses were necessarily on file with either the operator of the unit or the purchaser of the gas and thus easily ascertainable.

Appellants rely upon *Harry R. Carlile Trust v. Cotton Petroleum*, 732 P.2d 438 (Okla. 1986), *cert. denied* 483 U.S. 1021, 107 S. Ct. 3232 (1987), in support of their contention the Commission's orders are invalid for lack of jurisdiction. The *Carlile Trust* court found the Oklahoma Corporation Commission acted in a legislative capacity when it exercised is rulemaking powers to prevent waste and protect correlative rights, but in its adjudicative capacity when it applied the general rules to the facts.

The *Carlile Trust* case is distinguishable from this case in two very significant respects. In *Carlile Trust*, the Oklahoma Corporation Commission, unlike the Kansas Corporation Commission, had the authority to order compulsory pooling. It did so. The Oklahoma Supreme Court held compulsory pooling affected significant property interests of every interest owner in the Hugoton Field, and held the Commission violated due process by relying on publication notice when the interest owners' names and addresses were readily available. Also, in *Carlile*

*Trust,* the due process issue was raised by an injured party. 732 P.2d at 445.

In the case at bar, the Commission's order does not effect an involuntary change in existing property rights, but merely authorizes the optional drilling of a second well on each production unit after a justification hearing of which adjoining landowners are given personal notice.

It is contended royalty owners could be adversely affected by infill drilling because their economic interests conflict with the operators due to the flexibility permitted in locating the well. For instance, an operator who owned leases on adjoining tracts could realize the benefit of one infill well that drained more than one unit to the detriment of royalty owners of the tract being drained.

It is also pointed out that some royalty owners could be injured because their operators have less economic capability to drill additional wells than others, thus losing for the owner the increased income from the new well as well as possible drainage from an adjacent infill well drilled by a more financially secure operator.

These arguments ignore this salient point: The order does not change the contractual duty of the operator to the royalty owner, with its implied covenant to prevent drainage. The operator is liable to the owner for such loss. See *Rush v. King Oil Co.,* 220 Kan. 616, 556 P.2d 431 (1976). Also, gas leases are construed to contain an implied covenant to reasonably develop the owner's land. *Renner v. Monsanto Chemical Co.,* 187 Kan. 158, 167, 354 P.2d 326 (1960).

The contractual relationship between the operators and royalty owners places a prudent operator standard on the operator. Notice to all operators, which was given, thus protected the interests of the owners. Therefore, every party who might be adversely affected received actual notice through personal service, publication notice, or contractual obligations. It thus appears notice was reasonable under constitutional standards. This is not the determinative argument of the issue, however. The appellants do not claim violation of due process because of the notice afforded them. They make their argument on behalf of all the royalty owners who were not personally served with notice. The object of appellants' concern, the royalty owners, makes no

objection. Southwest, which represents royalty owners, was not only an active participant in the action, but supported infill wells.

It is a cardinal rule of constitutional law that only an injured party may raise a question of a violation of rights (*McGowan v. Maryland,* 366 U.S. 420, 429, 6 L. Ed. 2d 393, 81 S. Ct. 1101 [1961]; *State v. Thompson,* 221 Kan. 165, 172, 558 P.2d 1079 [1976]), subject only to limited exceptions not here applicable. *Phillips Petroleum Co. v Shutts,* 472 U.S. 797, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985). We hold appellants lack standing to raise the issue of lack of notice to royalty owners.

(3) The next jurisdictional issue is whether the Commission erred in amending paragraph (t) of the B.P.O. without notice at the same time it authorized an infill well on each unit.

Prior to April 24, 1986, paragraph (t) provided:

"To avoid the drilling of unnecessary wells and to prevent waste, no wells hereafter drilled in said common source of supply shall be assigned an allowable unless the Commission, after notice and hearing, finds that undue or uncompensated drainage is occurring beneath a tract on which said well is located, or that there is an actual need for additional wells to furnish gas to fulfull the market demands for gas from said field."

The Commission amended (t) as follows:

"To avoid the drilling of unnecessary wells and to prevent waste, no wells hereafter drilled in said common source of supply shall be assigned an allowable unless the Commission, after notice and hearing, finds that under all the circumstances appearing, such well is drilled pursuant to its Order issued July 18, 1986, in Docket No. 164-C, or undue or uncompensated drainage of gas is occurring beneath the tract on which such well is located, or that there is an actual need for additional wells to furnish gas to fulfill the market demands for gas from said field."

The amendment was proper pursuant to K.S.A. 1987 Supp. 55-706 and the language of the Commission's prior orders retaining jurisdiction for the purpose of entering such further orders as it deems necessary. Furthermore, K.A.R. 82-3-134 allows exceptions to the density provisions in a field covered by a proration order to allow the drilling of more than one well on a unit established by the order.

Appellants protest their lack of notice that such an amendment was contemplated. K.S.A. 1987 Supp. 55-605 states that "notice shall state the time and place of hearing and contain such other information as will briefly and adequately disclose the matter to

be considered or the relief sought." Appellants cite *Day v. State Corporation Commission,* 185 Kan. 165, 341 P.2d 1028, *modified* 185 Kan. 382, 345 P.2d 651 (1959), in which we held the Commission could not unilaterally grant an exception to the rules of the B.P.O. if the B.P.O. did not allow the granting of an exception. Instead, the Commission was constitutionally required to call a hearing for the purpose of amending the B.P.O. so that exceptions could be granted within a framework applicable to all producers and landowners in the field. *Day* differs from the instant case in that here a hearing was called for the purpose of amending the B.P.O. Appellants contend, however, that the Commission was required to give notice specifying that paragraph (t) was to be amended.

It is obvious from the notice given that Cities Service's requested amendment of the B.P.O. to allow infill wells might require amendment of other provisions to insure proper implementation of the order. The notice specified that amendment of the B.P.O. was being sought to allow the drilling of infill wells. The need to make amendments to specific paragraphs of the B.P.O. to allow infill drilling was recommended in testimony prefiled six months in advance of the hearing, and was responded to specifically by a witness for Williams. Thus, appellants had reasonable notice to prepare objections to the amendment of specific paragraphs of the order.

The amendment to paragraph (t) is merely a housekeeping amendment to make the infill amendment to paragraph (p) workable. We hold the notice afforded the parties hereto was broad enough to cover such an amendment.

(4) The final jurisdictional issue is whether the Commission lacked jurisdiction because of preemption by federal regulations to make an order which could, under certain circumstances, result in an increase in the price of gas. Appellants argue the infill proceeding was a de facto well classification under the N.G.P.A., 15 U.S.C. § 3301 *et seq.* (1982), intended to increase the price of gas and an indirect attempt to evade the exclusive federal scheme for the regulation of the price of natural gas sales in interstate commerce.

Under the Natural Gas Act (N.G.A.), 15 U.S.C. § 717 *et seq.* (1982), the transportation of natural gas in interstate commerce, the sale in interstate commerce of natural gas for resale for public

consumption, and the natural gas companies engaged in such transportation or sale are all subject to the exclusive regulation of federal agencies. The act is a comprehensive scheme of federal regulations of all wholesales of natural gas in interstate commerce. *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 682, 98 L. Ed. 1035, 74 S. Ct. 794, *reh. denied* 348 U.S. 851 (1954).

Natural gas prices are regulated under the N.G.P.A., which was instituted during a period of natural gas shortages. The N.G.P.A. established wellhead ceiling prices for sales of old natural gas dedicated to interstate commerce (§ 104) and ceiling prices for gas produced from new onshore production wells (§ 103). Most of the gas produced from the existing wells in the Kansas Hugoton Field is regulated pursuant to § 104, currently priced at an average price of approximately 60 cents per thousand cubic feet (Mcf). The price for gas from a "new onshore production well" under § 103, however, is currently priced at approximately $3.25 per Mcf. 18 C.F.R. § 271.101 (1988). However, because of current gas supply, the actual price bargained for is lower than the regulated price.

It has been consistently held that state regulatory bodies cannot effect price increases for the state's production under the guise of conservation measures. *Transcontinental Pipe Line v. State Oil & Gas Bd.,* 474 U.S. 409, 88 L. Ed. 2d 732, 106 S. Ct. 709, *reh. denied* 475 U.S. 1091 (1986) (following *Northern Gas Co. v. Kansas Comm'n.,* 372 U.S. 84, 9 L. Ed. 2d 601, 83 S. Ct. 646 [1963]).

The instant case differs from *Northern* and *Transcontinental* in that those cases dealt with orders which instructed interstate pipeline purchasers to take ratably from producers. The United States Supreme Court struck down the orders for two reasons. First, the ratable take orders fell within the limits of the comprehensive regulatory scheme created by Congress. Second, without ratable take requirements, purchasers were free to choose a less costly purchasing pattern, in keeping with Congress' determination that supply, demand, and price of natural gas be determined by market forces.

We adhered to this reasoning in our use of a two-prong test in *Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n,* 240 Kan. 638, Syl. ¶ 1, 732 P.2d 775 (1987), in which we upheld the Commission's order amending paragraph (p) of the B.P.O. We stated:

"In determining whether a state corporation commission's order improperly interferes with federal regulation of natural gas in interstate commerce, a two-part test is employed: (1) Whether the order falls within the limits of a comprehensive federal regulatory scheme rather than within the category of regulatory questions reserved for the states; and (2) whether the effect of the order will be to impair interstate market forces."

We found the order, which provided limits on production for each well in the field, was

"primarily directed at the production of gas rather than the marketing thereof and is necessary for the prevention of waste and the protection of correlative rights. Further, any effect upon interstate sales of gas is incidental rather than the objective of the order. Accordingly, the order does not transgress federal regulation of natural gas in interstate commerce." *Northwest Cent. Pipeline Corp.*, 240 Kan. 638, Syl. ¶ 3.

The United States Supreme Court has held that Congress has carefully circumscribed the field of federal regulation so as not to supplant the state authority over the production or gathering of natural gas. *Colorado Interstate Co. v. Comm'n.*, 324 U.S. 581, 598, 89 L. Ed. 1206, 65 S. Ct. 829 (1945); *Colorado-Wyoming Co. v. Comm'n.*, 324 U.S. 626, 89 L. Ed. 1235, 65 S. Ct. 850 (1945).

The present amendment of the B.P.O. is directed solely to the production and gathering of natural gas. It has no direct application to purchasers, such as appellants, but is directed to land-owners and producers.

Legitimate state action may not be found unlawful simply because such regulation may affect the profits of companies doing business in interstate commerce:

"It is obviously correct that any change in rates of production of gas sold in interstate commerce has an effect on the interstate market. But that alone does not eliminate the jurisdiction of the Kansas Corporation Commission. If so, the FERC would have total jurisdiction over all gathering and production of gas which is sold in interstate commerce." *Northwest Cent. Pipeline Corp.*, 240 Kan. at 645.

The legislative history of the N.G.P.A. states that:

"The legislation does not contemplate that FERC will intrude into the traditional conservation functions performed by the states. This is a matter reserved to the state agencies who, in the exercise of their historical powers, will continue to regulate such matters as drilling locations, completion techniques, production rates, etc." 124 Cong. Rec. 38,366 (1978).

The Joint Explanatory Statement of Committee on Conference states:

"In some instances, a State or Federal agency may designate a proration unit for a reservoir which it later determines cannot effectively or efficiently be drained by a single well. In such cases, the State or Federal agency may allow another well to be drilled on the same proration unit. The conferees do not intend a new well to be disqualified as a new onshore production well in such cases. The important factor in that determination is whether the portion of the reservoir covered by the unit will be effectively and efficiently drained by a single well." H. R. Conf. Rep. No. 1752, 95th Cong., 2d Sess. 81, *reprinted in* 1978 U.S. Code Cong. & Ad. News 8998.

This congressional statement of intent is consistent with the testimony of Richard Pierce, an authority on the N.G.P.A. who testified before the Commission. According to Pierce, Congress recognized it was frequently necessary to drill additional wells on a proration unit to enhance deliverability and the ultimate recovery of reserves.

The Natural Gas Act, 15 U.S.C. § 717(b) (1982), clearly limits FERC's authority as follows:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural gas companies engaged in such transportation or sale, *but shall not apply* to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the *production or gathering of natural gas."* (Emphasis supplied.)

The Commission made a specific finding the proceeding was held under the conservation statutes and not under the N.G.P.A. and the corresponding Kansas statute, K.S.A. 66-1,185. A separate application on a well-by-well basis is required to increase the price under the N.G.P.A. 18 C.F.R. § 271.305 (1988), K.S.A. 66-1,185, and K.A.R. 82-3-500 *et seq.*

Subject to the review and approval of FERC, a state agency having regulatory jurisdiction with respect to production of natural gas, such as the Commission, may be authorized under the N.G.P.A. to make a "determination" for the purpose of applying the definition of new wells under § 103(c). 15 U.S.C. § 3413(c) (1982), 18 C.F.R. § 274.103 (1988), 18 C.F.R. § 274.501(a)(2) (1988), 18 C.F.R. § 275.202 (1988). However, such determination must be made "in accordance with procedures applicable [to such agency] under the law of its jurisdiction for making such determinations." 18 C.F.R. § 274.103 (1988). Such determination is also limited by FERC rules for making § 103 determinations set out in 18 C.F.R. § 271.301 *et seq.* (1988) and § 274.101 *et seq.* (1988).

In 1979 the Kansas Legislature passed an enabling statute which provided "(a) The state corporation commission shall have such jurisdiction as is required to provide compliance with and carry out the requirements of the provisions of the [N.G.P.A.]. . . and with the rules and regulations adopted by [FERC] pursuant to such acts, and the state corporation commission shall adopt such rules and regulations deemed necessary for such purpose." K.S.A. 66-1,185. The Commission implemented the legislative mandate with rules and regulations for making well classification determinations under the N.G.P.A. K.A.R. 82-3-500 *et seq.*

Under 18 C.F.R. § 271.305(b)(1) (1988), the "jurisdictional agency"—the Commission—must "explicitly find" that the new well is necessary to "effectively and efficiently" drain the unit in order for its production to qualify for the maximum lawful price under § 103.

Appellants complain the term "effective and efficient" used in the Commission's order was not set out in the original B.P.O., the Kansas Statutes, or the Commission regulations. The original B.P.O. uses the term "adequately and sufficiently."

In its July order, the Commission found the April order "should be modified to expressly provide that: (1) the finding of effective and efficient requested by Cities Service is interchangeable with the phrase adequate and sufficient and the Basic Proration Order should be amended to include the effective and efficient language which appears to be the language currently prevailing in the industry."

Appellants argue the term is used by the Commission to match the term "effective and efficient" used in the N.G.P.A. of 1978, 15 U.S.C. § 3301 *et seq.* (1982), as a basis for § 103 price reclassification. The Commission found that any impact its "effective and efficient" finding might have on well classification proceedings is a matter for future determination.

Although the classification procedure which determines whether an infill well is necessary to effectively and efficiently drain a unit is usually made on a well-by-well basis, 18 C.F.R. § 274.207(a)(1) (1988) allows the Commission to request alternatives to the filing requirements of 18 C.F.R. § 274.204 (1988), including the requirement that geological evidence and engineering data be submitted for each well.

The Commission has applied to the FERC for such an alternative filing procedure. If the application is granted, the Commission will use the evidence from this infill proceeding rather than take evidence from each separate infill well classification application. However, the Commission is still required by 18 C.F.R. § 274.204 (1988) to process each infill well application on a well-by-well basis, K.S.A. 55-705b; K.A.R. 82-3-300; and each applicant is required to send notice to its purchasers pursuant to 18 C.F.R. § 274.201(d) (1988). If the purchaser timely protests, the matter is then set for hearing. K.A.R. 82-3-502 (1987 Supp.).

Once the Commission determines a well qualifies for a § 103 price, it must notify the FERC, which retains the authority to decide whether the determination was based on substantial competent evidence. 18 C.F.R. § 275.202(a)(1)(i) (1988). Any interested parties, such as interstate purchasers, may protest on this ground to the FERC. 18 C.F.R. § 275.203(b)(1) (1988).

Appellants contend if an infill well was actually needed on any unit to prevent waste or fulfill market demands, the Commission could have invoked paragraph (t) of the B.P.O. Instead, the Commission found that separate notice and hearing for each well would be "time consuming, impracticable, and burdensome."

Appellants argue the Commission's actions in dividing the basic proration unit allowable between the existing well and the infill well, providing for the assignment of individual allowables for the infill wells, and requiring each well to be separately metered and to accumulate overage and underage based on its own production, shows the Commission's true objective is to increase prices. It should be noted, however, that the B.P.O. prevents underage accumulated by the existing well to be reassigned to the infill well, absent a showing the existing well is not capable of operating.

The Commission rejected appellants' proposal of a proration formula where "the infill well would be assigned an allowable based on the ratio of its deliverability to the *unit's* deliverability." (Emphasis supplied.) Instead, the Commission arrived at a formula for assigning separate well allowables to the existing well and to the infill well which considers both deliverability and the acreage to be attributed to each well in the unit. For those units having only one well, the acreage factor would

continue to be the number of acres attributed to the unit divided by 640. For those units with an infill well, the acreage factor would, in effect, be divided between the original well and the infill well on a percentage basis; *i.e.*, 70-30% of the acreage factor during the four-year phase-in stage of the program, 60-40% during the fifth year, and 50-50% thereafter. The deliverability factor continues to be determined by the ability of each well to produce gas against 70% of the average field pressure of the wells in the Kansas Hugoton Field.

Appellants cite evidence from the record supporting their contention the order will ultimately result in higher prices which will hurt consumers. A K.P.L. witness presented an exhibit which projected Northwest Central as incurring additional gas costs in excess of $1.2 billion through 1992 from infill drilling, with a cost to Kansas customers of K.P.L. of approximately $480 million.

However, even if higher ceilings are allowed, the actual price of gas remains one of negotiation between the purchaser and the producer based on market demand, as would be the drilling of additional wells. After a careful review of the Commission's order in light of appellants' cogent arguments, we find it does not require a purchaser to buy greater quantities of gas or to buy from any particular well or gas field. It merely permits a producer the option of drilling an additional well on each production unit for the purpose of properly draining the unit. The stated purpose of the order is to assist in the effective and efficient gathering and production of natural gas from the Kansas Hugoton Field. This is the facet of regulation specifically reserved for state regulatory bodies. If the Commission's order ultimately results in a higher price for gas, it will be purely incidental to the drilling of an infill well and not the purpose thereof. We hold the Commission's jurisdiction in this case is not preempted by federal regulation.

IV. EVIDENTIARY SUPPORT FOR THE COMMISSION'S ORDER

(1) The issue is whether substantial evidence supports the Commission's finding that an infill well may be required to effectively and efficiently drain a production unit because of permeability barriers. Appellants argue no substantial evidence supports the Commission's finding that isolated zones of gas exist because such zones were not physically located or quan-

tified by witnesses. Appellants produced evidence before the Commission showing why they rejected the theory of isolated zones.

There was, however, other evidence supporting the theory that isolated and discontinuous zones exist in each proration unit in the entire field. While the evidence was controverted, there was substantial competent evidence supporting the Commission's finding. Therefore, we are not authorized to disturb it on appellate review.

(2) The next evidentiary issue is whether localized studies accepted by the Commission can provide a basis for finding such barriers exist on a field-wide basis where the Commission had rejected field-wide studies as unreliable due to the heterogeneous nature of the Hugoton Field.

Appellants argue Cities Service was the only appellee to present evidence supporting a field-wide order. Other appellees studied a limited area of the field and did not extend their results field-wide. Because the Commission rejected Cities Service's estimate of additional recoverable reserves, appellants argue it rejected the only field-wide quantification offered of the anticipated effects of infill drilling of the field.

However, Mobil's geological witness testified her localized study could be projected to the entire Kansas field. The study showed great variability in porosity and permeability which, the witness concluded, showed the existing bore holes were not effectively and efficiently draining the formation.

Further, Amoco's witness testified the geological data established that a relationship exists between the depositional characteristics of the rock in part of the field and permeability. He testified this factor provides a reliable basis for extending the test results in cored wells to areas of the field which have not been cored.

The Commission responded to appellants' argument as follows:

"29. It has been argued that the localized studies conducted by the geologists for the proponents cannot be extrapolated field-wide. The Commission disagrees. Collectively, the proponents have submitted substantial quantities of data concerning the geological characteristics of the Hugoton Field. This data base is adequate to make a reasonable field-wide extrapolation. The only alternative would be to conduct an exhaustive study for each proration unit. This alternative approach would be time-consuming, impracticable, and burdensome,

as well as extending beyond the burden of proof necessary to approve the application of Cities Service.

"30. Furthermore, the geological evidence, particularly that presented on behalf of Amoco Production Corporation, established that a relationship exists between the depositional characteristics of the rock in the Chase Group and permeability. The existence of such a relationship is a powerful tool for extending what is seen in·cored wells to other areas in the field which have not been cored."

We find substantial competent evidence to support the Commission's findings that localized geological studies can be extended field-wide in spite of its refusal to admit Cities Service's field-wide studies on reserves.

(3) The next evidentiary issue is whether substantial evidence supports the Commission's finding that infill drilling will protect correlative rights and prevent waste. K.A.R. 82-3-101(16) (1987 Supp.) defines correlative rights as follows:

" 'Correlative rights' means that each owner or producer in a common source of supply is privileged to produce from that supply only in a manner or amount that will not:

"(A) injure the reservoir to the detriment of others;

"(B) take an undue proportion of the obtainable oil or gas; or

"(C) cause undue drainage between developed leases."

Appellants contend the Commission erred in finding infill wells were necessary to protect correlative rights because no contention was made that uncompensated drainage across unit boundaries was occurring.

Appellants concede it is possible that additional production could be required to protect correlative rights in order to maintain pressure equilibrium, as indicated by *Northwest Cent. Pipeline Corp. v. State Corporation Comm'n*, 237 Kan. 248, 699 P.2d 1002 (1985), *vacated and remanded* 475 U.S. 1002, 89 L. Ed. 2d 289, 106 S. Ct. 1169 (1986), *aff'd on remand* 240 Kan. 638, 732 P.2d 775 (1987). They argue, however, that there is no evidence this was the reason for the Commission's conclusion. They note the Commission's own consultant did not find any significant pressure differences that would lead him to conclude uncompensated drainage was occurring. They argue that rather than being protected under the new order, correlative rights are in jeopardy from the temptation for operators to "corner-shoot" the wells since they are given flexibility in locating them.

However, the amended B.P.O. prohibits an infill well from being located closer than 1,250 feet from a unit boundary line

and 1,000 feet from any other well producing "from the same source of supply." Also, the infill well could not produce without first obtaining an allowable. This can be achieved only after giving notice *by mail* to any adjoining royalty owner, as required by paragraph (t) of the amended B.P.O., pursuant to K.A.R. 82-3-300. Further, any drainage is a breach by the lessee of the implied covenant to protect against drainage, for which the royalty owner can recover damages. *Renner v. Monsanto Chemical Co.,* 187 Kan. 158, 354 P.2d 326 (1960).

We agree with appellants, however, that there is no substantial competent evidence to support the Commission's finding that infill drilling is required to protect correlative rights. Although the amended B.P.O. corrects any possibility that correlative rights might be jeopardized by the authorization for infill wells, it has no relationship to conditions prior to the amendment of the B.P.O.

Two questions are thus presented. The first is whether the Commission has authority over the field when action is unnecessary to protect correlative rights. We hold it clearly does. The prevention of waste is the Commission's foremost function. K.S.A. 55-701; *Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 1, 6, 386 P.2d 266 (1963), *cert. denied* 379 U.S. 131 (1964).

Production may be regulated under K.S.A. 55-603 when required because of conditions "(a) constituting waste as herein defined, *or* (b) independently of waste, under conditions injurious to the respective correlative rights of the producers therein." (Emphasis supplied.) In *Aylward Production Corp. v. Corporation Commission,* 162 Kan. 428, 176 P.2d 861 (1947), we held the Commission had the authority to amend its rules upon its finding such amendment was necessary to prevent waste *or* injury to correlative rights.

The second question presented is whether the Commission's error in finding its order necessary to protect correlative rights invalidates the order. We hold it does not, as the order is necessary to perform the primary function of preventing waste. It is thus harmless error under K.S.A. 77-621(d).

Appellants argue, however, that there is not substantial competent evidence to support the Commission's finding that its order is necessary to prevent waste. The second part of the issue

is thus whether there is substantial competent evidence to support the Commission's specific finding that "without infill drilling, substantial reserves will not be recovered, thus causing physical waste." There is substantial competent evidence in the record that infill drilling will result in substantially increased reserves. Even a K.P.L. witness, an engineer, testified that infill drilling would recover an additional 1.5 to 3 Tcf from the field. Because of the many variables to be considered, there was considerable variance in the estimates of the quantity of gas which could be recovered from infill drilling. The Commission's estimate of 3.5 to 5 Tcf additional reserves is within the range of evidence, and thus should stand. See *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975).

Appellants argue against reliance on the studies in evidence, claiming they do not prove porosity is accompanied by sufficient permeability to allow production in commercial amounts. They also contend the studies do not conclusively prove that gas, rather than water or some other substance, is below the surface.

Appellants further argue that if gas pockets do exist, some are in pressure communication with existing wells and some are not. If they are, the existing wells will eventually drain them. There was testimony that *one* well could effectively and efficiently drain the whole field over geological time. If they are not in pressure communication, the gas pockets will remain in place until future market demand requires they be produced. Appellants contend substantial evidence thus does not support the Commission's finding that gas will be *lost* without infill drilling.

The Commission stated:

"62. Some of the opponents to infill drilling have advocated that infill drilling should be delayed until the present gas surplus is gone. The Commission rejects this contention for several reasons. First, such a contention ignores this Commission's duty to prevent waste and protect correlative rights. The record demonstrated that physical waste will result from the delay of infill drilling. Pressures in the field are declining to a point which make it difficult to obtain a satisfactory completion of a wellbore utilizing modern completion techniques. Furthermore, once reservoir energy is dissipated, it cannot be replaced. Reservoir energy is necessary for effective and efficient production of the remaining reserves. Likewise, as reservoir pressure decreases, recovery from low permeability zones becomes more difficult. Consequently, a substantial delay in infill drilling will result in a lower ultimate recovery, thereby causing waste."

Appellants argue this might be true of an oil field, but in a gas

field, declining pressure only indicates that drainage is efficient. They note that the same witness who testified the gas must be released before pressure further declined conceded that areas not in communication with the existing well bores cannot be imperiled by delay in infill drilling. He also stated that the low pressure areas of the field are the result of drainage by existing wells.

There is evidence, however, the appellants are incorrect in their assertion that declining pressure only indicates drainage. There is evidence that, as reservoir pressure goes down, recovery from low permeability zones does decrease, resulting in waste. Such evidence shows that gas *will* be lost without infill wells. Tenneco's petroleum engineer testified his studies caused him to conclude that formation heterogeneties exist within the field which result in non-uniform drainage. He testified this meant that unless a second well is drilled in each unit, a significant amount of gas will be left in the ground. He estimated 41% of the gas under the area he studied would not be recovered without an infill well.

A witness for Cities Service testified a delay in infill drilling will result in waste. Mobil's engineer testified pressures in the field are nearing a critical point below which modern completion techniques cannot be used effectively.

A petroleum engineer witness for appellant K.P.L. testified that as much as 10% of the gas remaining in the field might eventually be abandoned. On cross-examination, he acknowledged drafting a letter in which he stated two Tcf of reserves would be lost without infill drilling.

We hold substantial competent evidence supports the Commission's finding that waste would occur unless infill wells were authorized.

(4) The next evidentiary issue is whether the Commission erred in finding that *delay* in infill drilling will result in irretrievable loss of gas and thus be wasteful. There was testimony from Mobil's engineer that reservoir pressure had lowered to the point where action was critical in order to prevent waste. K.P.L.'s own witness agreed that, as reservoir pressure decreases, so does recovery from low permeability zones. He testified that a delay in infill drilling would result in lower ultimate recovery. Cities Service presented witnesses who agreed with K.P.L.'s testimony.

Appellants point out that K.P.L.'s witness had earlier testified no appreciable loss of gas would occur if drilling were delayed 60 years. They argue the witnesses relied upon by the Commission rebut its own claims concerning loss of gas because the areas from which it expects increased production are those which exhibit pressure at or above initial reservoir pressures. In that case, appellants note, it is evident the gas has not been produced in over 40 years of production in the field, and is not likely to be lost if infill drilling is further delayed.

Again, there is controverted evidence on the issue, but it is not for us to weigh the evidence. We only determine if substantial competent evidence was introduced supporting the Commission's findings. We find such evidence was introduced.

(5) Let us next consider whether substantial evidence supports the Commission's conclusion that infill drilling is necessary for recovery of slow-draining gas in order to prevent waste because gas not produced within the next 50 years is without economic value.

Appellants argue this finding, which they believe controlled the Commission's final order, is not a legal basis for finding the existing wells do not effectively and efficiently drain the field. They argue there is no support in the statutes or the Commission regulations which allow a ruling which finds slow drainage to be waste.

Findings of irretrievable loss with delayed drilling aside, the record provides evidence for the Commission's finding that gas not recoverable within 50 years is not economically valuable. In *Republic Natural Gas Co. v. State Corporation Commission,* 173 Kan. 172, 179, 244 P.2d 1196 (1952), we acknowledged that "[b]y the very nature of the business of conserving the gas supply the time element must be considered."

Appellants argue, however, that the rate of depletion in the field is determined not by the number of wells but by the market demand for gas. They contend the evidence shows existing wells can satisfy the market demand in the future. They argue Cities Service's study showing increase in production from infill wells was fatally flawed by an assumption that demand would increase.

The Commission made the following finding in regard to appellants' argument that slow drainage is not waste:

"It has been contended that effective and efficient drainage must be defined solely in geologic terms. The Commission disagrees. As shown by the reservoir simulation model study conducted by Amoco, substantial quantities of commercially recoverable gas that are in pressure communication with the existing well on the proration unit will take in excess of 180 years to recover, assuming maximum production rates against a line pressure of 25 p.s.i.a. The modeling study conducted by Mobil's engineers revealed the existing 5.8 Bcf of reserves connected to the present wells in the 25 well Nix study area would not be produced in less than 100 years without infill drilling. Cities Service has submitted evidence supporting its contention that it will take an additional 106 years to recover the remaining recoverable reserve connected to the existing wells without infill drilling. Furthermore, gas which will not be produced within 50 years has little or no economical value. [Citation omitted.] Regardless of whether it will take 100 years or 180 years to recover the gas connected to the existing wells, the Commission finds such a time period for recovery does not result in effective and efficient drainage of the reservoir."

Substantial competent evidence supports the Commission's findings.

(6) The next issue is whether substantial evidence supports the Commission's finding that a market will exist for the natural gas produced by infill wells. Appellants argue the evidence showed existing wells can meet the market demand through at least 1993 and that storage gives "plenty of lead time to infill drill" when additional reserves become necessary. They argue the existing market cannot absorb the higher N.G.P.A. § 103 prices which may result from the order. Testimony was presented that the productive capacity of the Field is over 200 Bcf (billion cubic feet) in excess of market demand. It was also conceded by Amoco and Mobil witnesses that the price of gas affects demand.

K.P.L. argues the Commission ignored evidence which showed infill drilling will be economically wasteful. Kansas law requires the Commission to consider all forms of waste. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 169 Kan. 722, 732, 222 P.2d 704 (1950), *reh. denied* 170 Kan. 341, 225 P.2d 1054 (1951). The Commission considered appellants' evidence but rejected it in favor of evidence showing waste would *result* from delay in drilling.

There was evidence in the record that the "gas bubble" is about to burst. Several pipelines purchasing gas from the field testified the gas surplus would be gone within the next two or three years. The Commission found the evidence showed con-

sumers are in a better position when they are assured availability of long-term gas supplies rather than waiting and taking emergency action when there is a shortage.

The Commission therefore held the infill program would commence on January 1, 1987, and be phased in over four years, with each operator to have the yearly option of drilling infill wells on 25% of its units, the option to be on a cumulative basis.

Appellants criticize the studies relied upon by the Commission. A witness for Amoco did a study which caused him to conclude there may be a shortfall in deliverability by 1989. Appellants criticize his use of peak demands in the study because he did not take into account the function of storage in meeting such demand.

Appellant K.P.L. also argues the Commission erred by failing to balance the costs of infill drilling against its benefits. However, the Commission found the evidence showed infill drilling would be economical for the producer. Appellants contest this finding, but also contend the Commission erred in relying on producer economics. The benefit to producers, they say, will come not from increased production but merely from being able to charge higher prices for gas already committed to specific markets. They argue the costs of the program as a whole must be balanced against the benefits as a whole. Cities Service conceded this itself.

The Commission lists other evidence it considered on the issue of market demand, however. It ultimately found that the recovery of reserves through infill drilling was a benefit to society which outweighed the costs of drilling. We hold this finding is supported by substantial competent evidence. We held in *Colorado Interstate Gas Co.*, 192 Kan. at 18, that the legislature has lodged with the Commission the determination of which method it should use or which factors it should consider in making its determination of market demand.

The Commission admitted the evidence on the present and future market demand for natural gas over appellees' objections. Appellees argued market demand was irrelevant to the Commission's determination under the conservation laws. The Commission held market demand was in issue pursuant to K.S.A. 1987 Supp. 55-703 and paragraph (t) of the B.P.O. The Commission staff argues evidence of economic impact may have a bear-

ing on the market demand, which in turn, has a direct relationship with the field's ability to produce. The end price of natural gas unquestionably has an impact on production trends and patterns in the Hugoton Field. The staff maintains that price disparities within the Hugoton Field can result in production disparity which in turn can impair correlative rights.

In *Colorado Interstate Gas Co.*, we held that while prevention of waste is the Commission's primary responsibility, it also has a responsibility to "allow sufficient production to meet the market demand if such can be done without waste." 192 Kan. at 24.

Appellants argue the Commission violated K.A.R. 82-1-232(a)(3) by not giving "a concise and specific statement of the relevant law and basic facts" which persuaded it that an adequate market exists for infill gas. Failure by the Commission to follow its own rules is error. We have held the Commission is required to give clear and complete findings of essential facts on which its orders rest. *Kansas Public Service Co. v. State Corporation Commission*, 199 Kan. 736, 744, 433 P.2d 572 (1967). The Commission is not, however, required to explain why it did not accept every piece of evidence presented. We find the Commission adequately explained its finding that a market exists for infill gas.

## V. MINIMUM WELL ALLOWABLES

The final issue is whether the Commission erred by departing from its past practice without a reasonable basis in its ruling on minimum wells. Where the Commission rules in a manner inconsistent with a previous decision, the law requires it explain its change in position. *Atchison, T. & S. F. R. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808, 37 L. Ed 2d 350, 93 S. Ct. 2367 (1973).

Appellants argue the Commission's final order, with its potential of granting an allowable in excess of the production costs of a minimum well, creates a departure from previous rulings. "Minimum" wells are those which would normally receive an assignment of less than 65 Mcf per day allowable under the standard proration formula. In the past, the Commission has decided a minimum well should be granted an allowable sufficient to pay the well's operating expenses, which was determined to be 65 Mcf.

Thus, in its minimum well order here, the Commission set the

allowable at 65 Mcf per day, per well. Appellants argue that while the costs of operating an infill well and an existing well are the same, prices charged for an infill well's production may be six times that from existing wells.

They also protest that the order will result in an inequitable shift in allowables to minimum wells. The Commission determines market demand every six months and determines the field's total deliverability. Allowables are allocated to each individual well on the basis of its "adjusted deliverability"—its measured deliverability adjusted by its acreage factor. Any well which is assigned an allowable less than the minimum—65 Mcf—but is capable of producing the minimum, is assigned the minimum. By computer, the Commission then checks the field, with minimum well allowables assigned first and the rest of the wells assigned on a pro rata basis. The allocation process is repeated until no new minimum wells are created. Evidence was presented that this method will shift approximately 3.6% of the field allowable to minimum wells. There was evidence such a shift "wasn't significant enough to worry about."

Appellants requested the Commission to assign an allowable of 65 Mcf per day to each proration *unit*, so that if two wells were on one unit, each well would receive an allowable of 32.5 Mcf.

Cities Service opposed the proposal, arguing the setting of a minimum of less than 60 Mcf per day would create artificial "stripper wells." A "stripper well" is a well which does not produce enough to recover its cost. Congress has granted such a well higher maximum prices than infill wells.

Cities Service's argument fails, however, because in order to qualify for stripper status, a well must not only *produce* at less than 60 Mcf; it must also be producing "at its maximum efficient rate of flow," a qualification which would exclude most wells. U.S.C. § 3318(b)(1)(B) (1982). The Commission has previously indicated that the assignment of an allowable is *not* a determination of the well's maximum efficient rate of flow.

The issue is decided, however, because the Commission has not in this instance been inconsistent with its previous decisions; in fact, it has consistently insisted that allowables be granted on a well-by-well basis rather than by the production unit. The Commission had a reasonable basis for its ruling. It

found allowables must be assigned to each individual well to prevent premature abandonment.

The judgment is affirmed.