(42 P.3d 162)
No. 88,013

WESTERN RESOURCES, INC., and KANSAS GAS AND ELECTRIC
COMPANY, *Petitioner/Appellants*, v. THE STATE CORPORATION
COMMISSION OF THE STATE OF KANSAS, *Respondent/Appellee*.

Opinion filed March 8, 2002.

*Martin J. Bregman*, Executive Director, Law, of Western Resources, Inc., of Topeka; *Michael Lennen*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita; and *James M. Fischer*, of Fischer & Dority, P.C., of Jefferson City, Missouri, for appellants.

*Caroline Ong*, advisory counsel, and *Susan B. Cunningham*, general counsel, of the Kansas Corporation Commission, for appellee.

*Walker Hendrix* and *Niki Christopher*, for intervenor Citizens' Utility Ratepayer Board.

*Kirk T. May* and *Matthew T. Geiger*, of Rouse Hendricks German May PC, of Kansas City, Missouri, for intervenor The Goodyear Tire & Rubber Company.

*Sarah J. Loquist* and *Thomas R. Powell*, of Hinkle Elkouri Law Firm L.L.C., of Wichita, for intervenor Unified School District No. 259.

*David J. Roberts* and *James P. Zakoura*, of Smithyman & Zakoura, Chartered, of Overland Park, for intervenor Kansas Industrial Consumers.

*Timothy E. McKee*, of Triplett, Woolf & Garretson, LLC, of Wichita, *Greg D. Ottinger*, of Duncan & Allen, of Washington, D.C., *Gary E. Rebenstorf*, city attorney, and *Joe Allen Lang*, first assistant city attorney, for intervenor City of Wichita.

*Kevin M. Fowler* and *John C. Frieden*, of Frieden, Haynes & Forbes, of Topeka, for intervenor City of Topeka.

Before RULON, C.J., LEWIS and KNUDSON, JJ.

KNUDSON, J.: Western Resources, Inc. (WRI) and Kansas Gas and Electric Company (KGE) filed this joint petition for judicial review from a final order of the Kansas Corporation Commission (KCC) in an electric rate proceeding instituted by the utilities.

Jurisdiction is conferred upon this court under K.S.A. 2001 Supp. 66-118a(b) and in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* In a separate but related appeal, KIC also filed a petition for judicial review from the KCC's order. See *Kansas Industrial Consumers v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 332, 42 P.3d 110 (2002).

On appeal, WRI and KGE contend the KCC erroneously interpreted or applied the law, the KCC's order was not supported by substantial competent evidence, and its decision was otherwise unreasonable, arbitrary, or capricious. We conclude the KCC acted within its authority, and there exists substantial competent evidence to support its findings and decisions to achieve just and reasonable utility rates.

## The KCC Proceedings

In November 2000, WRI filed an application with the KCC seeking an approximate $92,000,000 rate increase for its electric service division. On the same date, KGE, a wholly owned subsidiary of WRI, also filed an application with the KCC for a rate increase of almost $58,000,000. Both applications were consolidated into the same agency docket, 01-WSRE-436-RTS.

Various parties intervened in the proceedings before the KCC. The intervenors included Citizens' Utility Ratepayers Board (CURB), Kansas Industrial Consumers (KIC), City of Wichita, City of Topeka, Unified School District No. 259 (U.S.D. 259), Midwest Energy, Inc., Empire District Electric Company (Empire), Kansas Municipal Energy Agency, The Goodyear Tire & Rubber Company (Goodyear), ONEOK, Inc. d/b/a Kansas Gas Service Company, and Southcentral Municipal Energy Agency.

The KCC held evidentiary hearings on the applications from May 17, 2001, through June 4, 2001. Subsequently, all parties had the opportunity to file post-hearing trial briefs and reply briefs.

On July 25, 2001, the KCC issued a decision on the rate applications. Its order dealt with a wide variety of issues pertaining to the revenue requirements of WRI and KGE. The KCC ordered a decrease of KGE's revenue requirement by over $41,000,000 and increased WRI's revenue requirement by $18,470,583. Timely petitions for reconsideration attacking various portions of the initial order were filed by KIC, the KCC Staff, WRI and KGE, and the City of Wichita.

On September 5, 2001, the KCC issued its order on reconsideration. In this order, the KCC made various adjustments with respect to certain issues and clarified other points. The end result was a determination that WRI had an increased revenue requirement of $25,401,336 and KGE had a decrease in its revenue requirement of $41,062,598.

Timely petitions for reconsideration were filed from the order on reconsideration by KIC, WRI and KGE, and Goodyear. The petitions for reconsideration were denied in the KCC's final order of October 11, 2001. WRI and KGE filed this joint petition for judicial review.

### Standard of Review

Pursuant to K.S.A. 66-118c, this court reviews an order of the KCC under the KJRA. In their brief, WRI and KGE contend the KCC erroneously interpreted or applied the law, the KCC's order was not supported by substantial evidence, and the KCC's decision was otherwise unreasonable, arbitrary, or capricious. Those claims of error are consistent with the jurisdictional grant of the KJRA. See K.S.A. 77-621.

On appeal, the KCC's findings are presumed valid, and its order may only be set aside if it is not supported by substantial competent evidence, is without foundation in fact, or is otherwise unreasonable, arbitrary, or capricious. *Williams Natural Gas Co. v. Kansas Corporation Comm'n*, 22 Kan. App. 2d 326, 334-35, 916 P.2d 52, *rev. denied* 260 Kan. 1002 (1996).

The legislature has vested the KCC with broad discretion in weighing the competing interests involved in setting public utility rates. Because discretion is delegated to the KCC, the courts do not have authority to substitute their judgment for that of the KCC. The courts also have recognized that the KCC's decisions involve complex problems of policy, accounting, economics, and other special knowledge to achieve just and reasonable utility rates. Consequently, a court may not set aside a KCC order merely because the court would have arrived at a different conclusion had it been the trier of fact. The court may reverse or nullify a KCC order only when the decision " ' "is so wide of the mark as to be outside the realm of fair debate." ' " *Williams Natural Gas Co.*, 22 Kan. App. 2d at 335 (quoting *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 497, 720 P.2d 1063 [1986]).

## Imputation of Off-System Sales Revenues

WRI and KGE first challenge the KCC's decision to impute revenues to the companies for additional off-system wholesale sales of electricity as a result of new generation facilities brought on line during or shortly after the test year. WRI and KGE contend the revenues attributed to those facilities were speculative and contrary to the record. WRI and KGE also contend the KCC's decision was not based upon substantial competent evidence and post-hearing evidence proffered by the applicants was improperly rejected.

The test year adopted by the KCC ended on September 30, 2000. In their applications, WRI and KGE requested that the KCC include in their rate base costs relating to new generation facilities incurred outside of the test year. The new facilities included three combustion turbine peaking units at the Gordon Evans site and a Purchase Power Agreement (PPA) under which WRI could purchase 200 megawatts of capacity from Westar Generating, Inc.'s State Line facility; Westar is a wholly owned subsidiary of WRI. These new facilities created about 514 megawatts of new capacity for WRI retail customers. Two of the three Gordon Evans units went into service during the test year; the third unit went into service in June 2001. Westar's State Line plant went into commercial service in June 2001. The KCC determined the increased

capacity for WRI was a necessary and prudent investment and included the costs in WRI's rate base.

The above adjustment to rate base required the KCC to also consider whether the additional generation capacity would likely increase retail and off-system wholesale sales. The KCC agreed with WRI and KGE that the increase in retail customers was not sufficiently quantified. Next, the KCC noted the steady increase of wholesale sales in recent years and the marketing projections made by WRI and KGE to the financial analysts on Wall Street. Ultimately, the KCC added an additional $19,191,165 in revenue from off-system sales. The KCC's determination was based upon evidence that there would be 28,000 megawatt hours (MWh) available for off-system sales at $750 per MWh.

WRI and KGE challenged this adjustment in their petition for reconsideration. In their petition, WRI and KGE asked the KCC to consider additional evidence in the form of an affidavit with calculations from a WRI manager, Shane Mathis. In its subsequent order, the KCC declined to accept Mathis' affidavit, noting WRI and KGE had the opportunity to provide the information in a timely fashion as prefiled rebuttal evidence or during the hearing. The KCC also found that the determination there would be additional off-system sales was not speculative. However, the KCC did agree, "based on its familiarity with market conditions," the $750 per MWh was too high and reduced the adjustment to $12,794,600 based on a price of $500 per MWh. WRI and KGE filed a timely petition for reconsideration from this order that was denied by the KCC.

The KCC is to determine the reasonable value of property owned by a public utility which is used and required in its public operations. K.S.A. 2001 Supp. 66-128(a). Generally, property which has not been completed and dedicated to commercial service is not considered used and useful; however, the KCC has discretion to include the cost of uncompleted property in several circumstances. K.S.A. 2001 Supp. 66-128(b)(2). Moreover, we have previously recognized the KCC has discretion to include in rate calculations any costs and revenues not part of the test year if the changes are known and measurable. *Gas Service Co. v. Kansas*

*Corporation Commission*, 4 Kan. App. 2d 623, 635-36, 609 P.2d 1157, *rev. denied* 228 Kan. 806 (1980).

WRI and KGE contend the price finally adopted by the KCC—$500 per MWh—was several times greater than the prices actually received by the utilities for off-systems sales during the test year and, therefore, was speculative and unsupported by the record.

Various witnesses testified about the off-system sales issue with, predictably, a wide variety of proposals:

| Witness | Sponsor | Projected Sales | Price/MWh | $ Sales | Margin |
|---------|---------|-----------------|-----------|---------|--------|
| A. Crane | CURB | 28,000 MWh | $750 | $21M | — |
| T. Corrigan | Wichita | 435,000 MWh | $31.02 (net) | $30M | $13.5M |
| Ed Bodmer | Topeka | — | — | — | $11M |
| Leslie Morgan | WRI/KGE | (Unspecified) | $7.49 (net) | — | — |

In challenging the KCC's decision, WRI and KGE argued their generating facilities performed at extraordinarily high levels during the test year, which permitted higher off-system sales than normal, and that performance would be unlikely to continue. In their applications, WRI and KGE reduced their revenue requirement by $11.8 million to account for "as available" wholesale sales made during the test year. They argue any other adjustments are speculative. The utilities also argued the new generation capacity was created to service their retail load obligations and to reduce the potential for power outages and increased costs for purchases on the spot market; therefore, the new capacity should not be linked to increased wholesale transactions. Finally, they refer to evidence indicating the average wholesale market price actually received by WRI from 1994 to 2000 ranged from $27.24 to $31.16 per MWh, averaging $30.80 for the last 3 years.

WRI and KGE admitted they always try to maximize their sales margins and acknowledged the possibility of increased off-system revenues. WRI has a power marketing group which serves both utilities as well as other operations of WRI. The group provides power trading and wholesale marketing services with the purpose of trading or selling power on the wholesale market; there was some evidence the group used utility assets to make these sales. The record also established a fairly steady increase in WRI's off-system sales between 1994 and 2000.

The KCC relied heavily upon the testimony of CURB's expert witness, Andrea Crane, who based her projections of $750/MWh on a WRI presentation of potential earnings made to financial analysts. WRI and KGE contend this presentation was merely potentialities proposed to analysts that were based on assumptions of the most favorable possible market. The KCC found Crane's calculations reasonable and in its initial order adopted them, thereby imputing additional revenue of just over $19 million.

On appeal, WRI and KGE argue that Crane's calculations were speculative and contrary to the clear tenor of the other evidence regarding actual wholesale prices and volumes. Once testimony is admitted in a rate case, the KCC has discretion to weigh and accept or reject that testimony. *Kansas Gas & Electric Co. v. Kansas Corp. Comm'n*, 14 Kan. App. 2d 527, 538, 794 P.2d 1165, *rev. denied* 247 Kan. 704 (1990).

We are not impressed with the contention Crane's testimony does not constitute substantial competent evidence of off-system revenues. We believe it is disingenuous for WRI to argue its representations to Wall Street analysts and the financial markets should be considered tantamount to exaggerated puffery rather than an honest appraisal of expected growth and earnings. We conclude WRI's representations to potential investors and analysts constitutes credible evidence to support Crane's opinion and the ultimate finding entered by the KCC. Moreover, as we will next discuss, on reconsideration the KCC mitigated from the high side of Crane's calculations.

On reconsideration, the KCC reduced the off-system sale price projections to $500 per MWh. WRI and KGE contend there is no evidence in the record to support that price figure and that the KCC erred in using a price figure based on "its [the KCC's] familiarity with market conditions." In connection with this argument, WRI and KGE also contend the KCC erred in relying on its own knowledge while denying the companies' request to add additional testimony through the affidavit of Shane Mathis that was included with their motion to reconsider.

With respect to the KCC's refusal to consider the supplemental affidavit of Shane Mathis, the standard of review is abuse of dis-

cretion. See *Kansas Pipeline Partnership v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 42, 50, 941 P.2d 390, *rev. denied* 262 Kan. 961 (1997). See also *Kansas Gas & Electric Co. v. Kansas Corp. Comm'n*, 14 Kan. App. 2d at 537 (admission of expert testimony lies within KCC's discretion in hearings before that body).

After a KCC hearing has ended, a party may request, if good cause is shown, that the record of testimony be reopened. K.A.R. 82-1-230(l). When seeking to submit additional evidence in a petition for reconsideration, the additional evidence must have either been not available or not known to exist at the time of the hearing. K.A.R. 82-1-235(c)(4). In addition, the nature and purposes of the evidence must be briefly stated and cannot merely be cumulative. K.A.R. 82-1-235(d).

WRI and KGE do not contend Mathis' evidence was either new or undiscoverable. They conceded the affidavit was somewhat cumulative (although more specific) of the evidence presented at the hearing. WRI and KGE also argue that if the KCC can rely on evidence outside the record (*i.e.*, its own knowledge of prices), it was arbitrary not to accept the additional evidence.

In support of this argument, WRI and KGE refer to *Colorado Interstate Gas Co. v. F.E.R.C.*, 850 F.2d 769 (D.C. Cir. 1988). In *Colorado Interstate*, the appellate court held FERC's unexplained decision to treat Kansas and Texas ad valorem taxes differently for purposes of natural gas price caps was the "quintessence of arbitrariness and caprice." 850 F.2d at 774. WRI and KGE fail to explain how this case supports their claim that the KCC's refusal to accept additional evidence was somehow unlawful or arbitrary.

In this case, the KCC held extensive evidentiary hearings over a period of at least 12 business days. The record consists of 62 volumes (plus five notebooks) of pleadings, prefiled testimony, exhibits, hearing transcripts and post-trial briefs and motions. WRI and KGE presented prefiled rebuttal testimony from the witness in question, Shane Mathis, who testified about WRI's power marketing business and, to a limited extent, its wholesale sales practices. This rebuttal testimony was filed well after the testimony of Andrea Crane and Timothy Corrigan, who both gave opinions regarding the off-system sales issue.

WRI and KGE have not justified their failure to file prefiled rebuttal testimony or present this evidence more specifically in the KCC hearings. We conclude the KCC did not abuse its discretion in declining to reopen the record for evidence that could have been presented during the hearing.

A remaining issue is whether the KCC's finding of a $500 per MWh price figure for off-system sales which was based on its "own familiarity" with the market is supported by substantial and competent evidence. We answer this question "yes" because the KCC's determination was within a zone of reasonableness. The Kansas Supreme Court has observed:

"There is an elusive range of reasonableness in calculating a fair rate of return. A court can only concern itself with the question as to whether a rate is so unreasonably low or so unreasonably high as to be unlawful. The in-between point, where the rate is most fair to the utility and its customers, is a matter for the State Corporation Commission's determination." *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, Syl. ¶ 17, 386 P.2d 515 (1963).

See also *Farmland Industries, Inc. v. Kansas Corporation Comm'n,* 24 Kan. App. 2d 172, 195, 943 P.2d 470, *rev. denied* 263 Kan. 885 (1997) (in fixing a rate within the zone of reasonableness, the KCC must apply a balancing test considering the interests of all concerned parties).

In this proceeding, the KCC finding was a final adjustment of $12,794,600 of additional off-system revenues. This adjustment was consistent not only with Crane's testimony but also with the testimony of two other expert witnesses, Timothy Corrigan and Ed Bodmer. Corrigan recommended a net sales revenue of $13.5 million. Bodmer proposed a net sales revenue of approximately $11 million.

For all of the foregoing reasons, we conclude the KCC did not err in its imputation of additional off-system sales revenues.

### Unamortized Gain—LaCygne 2

The second issue raised by WRI and KGE concerns an adjustment to rate base entered by the KCC to recognize an unamortized gain realized by KGE on the sale of the LaCygne 2 electric gen-

erating plant in 1987. This ruling reduced KGE's rate base by $86.5 million.

In 1987, KGE entered into a financing arrangement to sell its 50% interest in the new LaCygne 2 facility (a coal-fired generating plant) to an owner-trustee and lease the facility back for approximately 29 years. At the end of the lease, KGE would have the option to renew the lease or purchase the plant at fair market value. The sale price for the plant, $392.1 million, far exceeded the book value of $69.4 million.

In seeking approval of the sale/leaseback transaction, KGE advised the KCC the transaction permitted it to capture certain tax benefits as a lessee that it would not have as an owner. KGE also claimed this transaction benefitted customers by delaying rate increases, causing some rate reductions, and improving KGE's financial health.

The KCC approved the sale/leaseback transaction in September 1987 in KCC Docket No. 156,521-U. The KCC, in its order, agreed that KGE's ratepayers might benefit from the transaction, but only if KGE's rates accurately reflected the company's revenue requirement. The KCC noted the exact impact of the sale could not be accurately determined at that time. According to the order, KGE proposed to amortize the gain on the sale to its Kansas jurisdictional cost of service over the life of the lease and proposed that any unamortized gain could be used in reducing rate base in future rate cases.

In approving the sale, the KCC specifically directed its Staff to investigate "all aspects of KG&E's cost of service" and to determine whether existing rates accurately reflected KGE's revenue requirement. Staff was ordered to report its findings to the KCC, which would then determine if any rate adjustments were necessary.

When the present rate case was filed, the Staff of the KCC and the KIC proposed that KGE's rate base be adjusted to treat the remaining unamortized gain from the sale of the LaCygne facility as cost-free capital. The Staff witness, James Proctor, testified that KGE realized a $322.7 million gain from the sale of the facility and recommended KGE's rate base be reduced by $86.5 million. Proc-

tor testified he was on the KCC's Staff in 1987 and that the KCC approved the sale-leaseback because KGE offered to allow consideration of any unamortized gain in future rate cases. WRI and KGE concede that at the time of the current proceeding, over $87 million of the net gain from the LaCygne sale had not yet been amortized on KGE's books.

Similarly, James Dittmer, an expert testifying on behalf of KIC and Goodyear, stated the gain from the sale of the LaCygne facility essentially was cost-free capital and unless rate base was reduced to reflect this gain, the ratepayers would effectively be paying interest or an equity return on funds which had no true financing cost. Moreover, it would allow the utility to pay the higher lease payments (which included a premium over the book value of the plant) without offsetting those higher costs with the accompanying gain the utility received in the transaction. Dittmer recommended KGE's rate base be reduced by $86 million.

Dittmer acknowledged ratepayers have benefitted from the "levelizing" effect of the sale/leaseback and the amortization of the gain in the cost of service calculation already recorded by KGE. However, he explained the proposed adjustment was not a double benefit to ratepayers, but instead would prevent shareholders from earning a return on cost-free capital. Dittmer also noted WRI and KGE were not contending the adjustment would deprive company shareholders of a fair rate of return.

In opposing this proposed adjustment, WRI and KGE presented testimony that the LaCygne sale/leaseback was designed to improve KGE's financial health. The companies also noted previous orders of the KCC did not intimate the gain should be used to reduce KGE's rate base. Other arguments were that the proposed adjustment gave a double benefit to ratepayers and ignored the "true economic reality" of the transaction, the ratepayers more than benefitted because the sale proceeds were used to reduce the cost of capital by repurchasing stock and buying back high coupon debt, thereby reducing KGE's cost of service, and reference in the 1987 order regarding KGE's offer to permit unamortized gains to be used to reduce rate base was inconsistent with KGE's rate application.

In the present case, the KCC ordered the remaining $86 million unamortized gain from the 1987 transaction be used to reduce KGE's rate base. The KCC agreed the proceeds should be considered cost-free capital and noted this same adjustment was proposed by Staff in a 1997 rate proceeding involving the companies, Docket Nos. 193,306-U and 193,307-U. Finally, the KCC rejected WRI and KGE's arguments that the 1987 order misstated KGE's proposal; the KCC reasoned that if KGE disagreed with the language of the 1987 order, it should have filed a timely petition for reconsideration.

On appeal, WRI and KGE argue the KCC has unreasonably deviated from its order in prior KGE rate proceedings contrary to Kansas law. Generally, our appellate courts recognize a regulatory body has authority to change positions on an issue if the new position is supported by substantial competent evidence. Thus, parties may not reasonably rely on any prior order of the body to such an extent to invoke the doctrine of equitable estoppel. *Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n*, 237 Kan. 248, 259, 699 P.2d 1002 (1985), *vacated on other grounds* 475 U.S. 1002, 89 L. Ed. 2d 289, 106 S. Ct. 1169 (1986). However, our courts also have recognized that when an administrative agency deviates from a policy it had adopted earlier, it must explain the basis for the change. *Farmland Industries, Inc. v. Kansas Corp. Comm'n*, 24 Kan. App. 2d at 191. Where the KCC rules in a manner inconsistent with a previous decision, the law requires the commission to explain its change in position. *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 190, 769 P.2d 1 (1989).

In this case, however, WRI and KGE have failed to establish the KCC deviated from any prior orders. The KCC's 1987 order clearly indicated the KCC was concerned about the lack of clarity as to how KGE would treat the gain it would realize in the sale of the property. The order approving the transaction specifically noted KGE proposed to amortize the gain on the sale to its Kansas jurisdictional cost of service over the life of the lease transaction and that any unamortized gain could be considered as rate base adjustments in future rate cases. Based on the clear language of the

order, the adjustment ordered in the present case was consistent rather than inconsistent with the 1987 order.

KGE argues the 1987 order language was inconsistent with KGE's original application. KGE also argues this reference to future rate cases was not binding because it was not included in the order language at the end of the KCC's order. Neither of these arguments are compelling. KGE's original application clearly proposed that in addition to the allocation of the gain through amortization to cost of service, "the benefits from the disposition of the proceeds from the Transaction will be passed on to ratepayers." This seems to give broad assurances about the benefits ratepayers would receive. Morever, the order language in the 1987 ruling dealt with authorizing the sale/leaseback transaction and its *current* rate treatment. The KCC, as always, retained jurisdiction over the issues. Finally, nothing in subsequent proceedings involving KGE altered the provision from the 1987 order, recognizing the possibility of future reductions of rate base by unamortized portions of the gain.

For these reasons, the KCC's decision to allow a reduction of KGE's rate base for the unamortized gain is not inconsistent with prior KCC orders or rulings. The fact the KCC initially permitted KGE to amortize the gain does not alter the fact KGE was on clear notice of the possibility that any remaining unamortized portions might, in future cases, be used to reduce its rate base.

WRI and KGE also argue the LaCygne 2 adjustment is illegal because it gives all the benefits of the sale to ratepayers in violation of *Kansas Power & Light Co. v. Kansas Corporation Commission*, 5 Kan. App. 2d 514, Syl. ¶ 3, 620 P.2d 329 (1980), *rev. denied* 229 Kan. 670 (1981).

In *Kansas Power & Light Co.*, the utility challenged the KCC's rate determination. One of the issues related to the agency's treatment of a $1.4 million gain from the sale of the company's office building in Salina. The KCC allocated a portion of the gain in a manner to reduce rate base, even though the Federal Energy Regulatory Commission (FERC) accounting rules permitted this type of gain to be credited "below the line," which inures to the stockholders. This court ultimately concluded that while the general rule

is that capital gains are retained by the utility, the KCC may consider the gain as a factor in the ratemaking process. 5 Kan. App. 2d at 528. This court also concluded that a KCC order that effectively gives all the profit from the sale of a capital asset to ratepayers is improper; the case was remanded with instructions for the KCC to provide a method to permit both stockholders and ratepayers to benefit from the transaction. 5 Kan. App. 2d at 529.

*Kansas Power & Light Co.* is factually distinguishable because it involved the outright sale of a capital asset. The KCC's 1987 order clearly reflects that the sale/leaseback transaction with the La-Cygne 2 plant was primarily a financing device designed to improve the company's financial situation. Under the lease agreement, KGE had the right to extend the lease or buy back the plant at fair market value at the end of the 29-year lease.

Even if we were to assume *Kansas Power & Light Co.* applies, it is undisputed that the sale/leaseback transaction has benefitted ratepayers. On the other side of the ledger, KGE's assertion that the KCC's finding would somehow deprive shareholders of all benefit from the underlying transaction is not supported by citation to the record. Moreover, we have been unable to find from the evidentiary record the testimony of any witness that reducing KGE's rate base 14 years after the transaction would deprive the shareholders of all benefit from the transaction. Common sense would seem to dictate shareholders did receive benefits from the transaction. KGE received over $300 million in profit from the sale and had the use of the money, cost free, since 1987. Additionally, KGE's decision to use the proceeds to buy back stock and redeem high coupon debt benefitted both ratepayers and shareholders.

Finally, WRI and KGE contend there is not substantial competent evidence to support the KCC's decision. The testimony of James Dittmer and James Proctor discussing KGE's ability to use the sale proceeds as cost-free capital more than support the KCC's decision to finally reduce KGE's rate base by the balance of the unamortized gain. KGE had the full use of the proceeds for 14 years. There was no evidence that reducing rate base would deprive KGE's shareholders of a fair share of the benefits of the sale/leaseback transaction.

For all of the foregoing reasons, we conclude the KCC's order regarding the LaCygne 2 adjustment is not contrary to prior KCC orders. There is no evidence that KGE's shareholders were deprived of benefit from the proceeds from the sale/leaseback transaction. Moreover, the decision is supported by substantial competent evidence.

## The ADIT Adjustment

WRI and KGE contend the KCC's rate base adjustment and related revenue adjustments related to the acquisition premium (AP) paid by Kansas Power & Light Company (KPL) to acquire KGE constitutes error. The utility argues the decision is (1) contrary to prior KCC orders in the merger case and other rate cases involving the companies; (2) constitutes a taking of property and interference with contract rights; and (3) is factually and legally unsound.

We begin our discussion by first reviewing the 1991 merger of KPL and KGE. In 1991, KPL and KGE merged into a single entity known as KPL (which later became WRI). As part of the merger agreement, KPL agreed to pay an AP to KGE shareholders. An AP is a payment above the book price for the company. The total AP in this merger was approximately $500 million.

In the merger proceeding, Docket Nos. 172,745-U and 172,155-U, the KCC refused to allow the companies to include the AP in their rate base. However, the KCC determined that $312 million was a reasonable approximation of likely cost savings from the merger. Because these savings were anticipated, the KCC ruled the companies could recover this portion of the AP from ratepayers by amortizing the amount as operating expense over 40 years. This allowed the companies to amortize $7.8 million annually beginning in 1995; to net this amount, however, the actual expense was "grossed up" to $12.9 million to recover current income taxes that would have to be paid.

The KCC also decided that if there were additional merger savings above the $312 million, those savings should be shared equally by ratepayers and shareholders. The KCC specifically declined to place the AP in the rate base and stated that the companies' only

opportunity to "earn a return of or on the allowed AP will be from merger-related savings."

In 1997, the KCC conducted the first post-merger rate proceeding for WRI and KGE. Ultimately, WRI, KGE, and the KCC Staff entered into a settlement agreement to resolve all issues pertaining to revenue requirements. The KCC issued an order approving the settlement agreement with a determination the annual merger savings was $40 million. The KCC permitted WRI to treat $13.5 million of the saving as additional operating expenses and to continue to amortize the AP as operating expense of $12.9 million annually.

This brings us to the present proceedings. In its order of July 25, 2001, the KCC ordered a decrease in KGE's rate base of $66,295,177 and a decrease in WRI's rate base of $16,698,284. To support this adjustment, the KCC found as follows:

"64. *Accumulated Deferred Income Taxes.* KPL paid an acquisition premium (AP) when it merged with KGE. An AP is a sum above book value that an acquiring company agrees to pay to shareholders of a company that is being acquired. In a 1991 Order, the Commission allowed the Applicants to begin amortizing approximately $12.9 million of the AP annually in 1995. The Commission stated that at that time, it was not allowing the AP to be put in rate base. The Applicants' only opportunity to earn a return of or on the AP would be from merger-related savings. Savings above the annual amortization amount were to be determined in the next rate case and shared 50-50 between ratepayers and shareholders. Pursuant to the Order, 50% of the savings above the allowed amortization would be included in cost of service. [Citations omitted.]

"65. In 1997, in Docket Nos. 193,306-U and 193,307-U, the annual merger savings were found to be $40 million. The amount above the $12.9 million amortization figure was approximately $27 million. Of the $27 million, 50% was to be imputed as an operating expense when calculating the Applicants' regulated earnings. Approximately $13.5 million was to be treated as an operating expense, and approximately $12.9 million per year was being amortized, for a total revenue requirement recovery related to the AP of $26.5 million. [Citations omitted.] The $26.5 million is recovered annually in rates through the operating income statement. [*Citation omitted.*]

"66. Staff argues that the Applicants are receiving a return *of* and a return *on* the AP through rates, and that the effect of this is equivalent to rate base treatment. Staff asserts that its Accumulated Deferred Income Tax (ADIT) adjustment is a standard adjustment for rate base items and that if it is not accepted, the Applicants will receive an unfair benefit. Staff maintains that accepting this ad-

justment is not inconsistent with prior Orders. Staff's adjustment is also supported by Wichita. The Applicants rely on the 1991 Order which said that the AP was not being put in rate base. They argue that an ADIT adjustment was not contemplated and that no rate base offset is justified. [Citations omitted.]

"67. The Commission accepts Staff's adjustment. ADIT was not mentioned at the time of the 1991 and 1997 Orders [citation omitted], but the Commission finds that this was because ADIT did not become an issue until after the $26.5 million amount was determined and the Applicants began to recover that amount. [Citation omitted.] As Staff indicates, including ADIT in rate base is standard to recognize for ratemaking purposes the cost-free capital provided from ratepayers related to differences between when expenses are deducted for regulatory and income tax purposes. There would be no need to specifically refer to such an adjustment in an Order. Including ADIT in rate base is a well-recognized regulatory accounting concept that is applied in a variety of situations to account for deferred income tax benefits related to rate base assets or for timing differences between when expenses are deductible for income tax purposes and financial reporting purposes. [Citation omitted.]

"68. There is no dispute that the Applicants are receiving both a return *of* and a return *on* the AP. [Citations omitted.] This is equivalent to the AP being in rate base. A rate base item would normally have a related ADIT component. [Citation omitted.] The ADIT adjustment addresses the benefit the Applicants derive from collecting deferred income tax expense through the annual recovery of $26.5 million in merger savings. Through rates, the Applicants are collecting deferred income taxes related to the AP from ratepayers. [Citation omitted.] The deferred income taxes are collected before the Applicants are required to pay income tax expense for the amortization of the AP. The result is an increase in expenses for purposes of calculating rates before the utility actually has to pay the expenses. Because the Applicants collect deferred income tax expenses related to amortization of the AP through rates, it is necessary to recognize the unamortized ADIT in rate base to avoid an unjust benefit accruing to the Applicants. [Citations omitted.]

"69. Deferred income taxes are recovered as part of the $26.5 million annual recovery. The equivalent amount of AP in rate base is determined by calculating the present value of the annuity represented by annual collection of the $26.5 million through rates over a 34.83-year period. Using the rate of return ordered in this case to discount the annuity, the Commission finds that $208,644,237 of the AP is receiving equivalent rate base treatment. Further, because deferred income tax is collected as part of the $26.5 million, the Applicants are in effect receiving rate base treatment for the present value of the deferred income tax payments. That is, the Applicants receive a return on the present value of the deferred income tax payments. Because the Applicants receive a return on the present value of the deferred income tax payments and recovery of the deferred income tax essentially provides an interest-free loan from the ratepayers to the Applicants, it is necessary to decrease rate base by ADIT to avoid an unfair benefit

to the Applicants. [Citations omitted.] A cost-free loan from ratepayers should not be in rate base. The ADIT adjustment deducts the amount of taxes that correspond to the cost-free capital that the Applicants recover every year as part of the $26.5 million. The Applicants collect deferred income taxes from the ratepayers, and have the use of that money until the time when the taxes are ultimately paid. The ADIT adjustment deducts from rate base the amount of funds that are collected from ratepayers by the Applicants, but are yet to be paid. Without the ADIT adjustment, the Applicants would receive a revenue windfall from ratepayers. The ADIT adjustment, taking into consideration the ROR ordered, results in a decrease in KGE's rate base of $66,295,177, and a decrease in WRI's rate base of $16,698,284. [Citations omitted.]

"70. *Staff's ADIT adjustment is conservative.* Instead of simply using the Applicants' records which show a return of the AP of $12,951,970 [citation omitted], and calculating the benefit to the Applicants over the remaining 35-year amortization period, Staff determined the present value of the cash-flow from the ratemaking treatment and based its ADIT adjustment on that number. While the Applicants' records would have supported the argument that the $26.5 million AP recovery is equivalent to placing $453 million of the AP in rate base, Staff concluded that it was more appropriate to use its methodology which finds that the recovery is equivalent to having approximately $220.6 million of the AP in rate base. *Staff's calculations result in a lower ADIT adjustment.* [Citations omitted.] [Given the rate of return ordered in this case, the recovery is equivalent to having in rate base the $208 million figure stated above, instead of the $220 million discussed at the hearing.]

"71. The Applicants assert that Staff has failed to consider that they are paying current income taxes on the $26.5 million that they recover. Staff did consider this, but stated that it was not relevant because the $26.5 million had been grossed up for income taxes. [Citation omitted.] The return of the AP was approximately $7.8 million annually. In the 1997 Order, the amount was set at $12.9 million to take into account the income taxes that would be paid. [Citation omitted.] That is, it was 'grossed up' for income tax expense to recognize the income tax expense related to the amortization of the AP. Because the current income taxes were anticipated and accounted for when setting the $12.9 million recovery amount, those current taxes are not an issue now. The payment of current income taxes simply represents the Applicants paying off the cost-free capital provided by ratepayers through the Applicants' previous recovery of deferred income tax expense. The Applicants also contend that Staff is trying to 'create' deferred taxes. This is incorrect. The deferral of income taxes is recorded on the books of the Applicants. As noted above, this is not unusual and is handled through a standard adjustment for ADIT."

As a necessary corollary, the KCC also ordered income statement adjustments in paragraph 92 of its findings, stating: "c. Staff's ADIT rate base adjustment requires a decrease in deferred income

tax expenses of $1,903,393 for KGE, and a decrease of $479,422 for WRI."

In its order on reconsideration dated September 5, 2001, the KCC refused to modify its previous order and elaborated as follows:

"9. Several arguments relating to the accumulated deferred income tax (ADIT) adjustment have been made. This issue was discussed extensively in the July 25, 2001 Order. [Citation omitted.] Although WRI and KGE make numerous complaints about the Commission's Order, they do not dispute the primary justifications for the ADIT adjustment. WRI and KGE do not contest the finding that they are receiving both a return on and a return of the acquisition premium (AP). In fact, a document verifying this fact, CURB Exh. 12, originates from WRI and KGE. Exhibit B, which WRI and KGE attach to their petition as support for their argument that this is not equivalent to rate base treatment, relies upon an incorrect number and is not a valid analysis of the Commission's Order. Exhibit B starts with the premise that the Commission is comparing the amount of its adjustment to the placement of $312 million in rate base. This is inaccurate. As stated in ¶¶69-70 of the July 25, 2001 Order, the adjustment adopted by the Commission is equivalent to placing approximately $208 million of the AP in rate base. The other numerical arguments and calculations of WRI and KGE suffer from similar problems and provide no basis for changing the ADIT adjustment.

"10. The ADIT arguments made by WRI and KGE were fully considered in the July 25, 2001 Order. The 1991 merger order established a non-traditional method for dealing with the AP. In reviewing the arguments relating to the ADIT adjustment, the Commission has looked at what is happening in reality and the effect on the utilities and ratepayers. WRI and KGE are receiving the same benefits as if $208 million of the AP had been directly placed in rate base. In recognizing this, the Commission must make the appropriate ADIT adjustment. This adjustment is consistent with the KPL-KGE merger framework and with the 1991 and 1997 Orders. The Commission finds no grounds for reconsidering the ADIT adjustment."

Thereafter, in its order of reconsideration, the KCC stated the overarching constitutional and legal principles applicable to rate-making decisions to be as follows:

"27. WRI and KGE maintain that the end result of the Commission's Order is outside of the 'zone of reasonableness.' In rate-making cases, the Commission must consider and balance the interests of utility investors, current ratepayers, future ratepayers and the overall public interest. After balancing these interests, the Commission must determine what rate within an elusive range of reasonableness is most fair to the utility and its customers. *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 488-91, 720 P.2d 1063 (1986). In

this proceeding, each ruling was carefully considered and the interests of all parties were painstakingly balanced. The overall result and the rates ordered are fair, reasonable and supported by the record."

In our opinion, it was the duty of the KCC to determine the impact of the merger savings and prior commission orders on the issue of fair and just rates. The central question to be answered was whether an adjustment to rate base was necessary to carry out the KCC's intent that there would be a 50-50 sharing of the merger savings between ratepayers and shareholders through the allowance of increased operating expenses. To answer that question, the KCC annuitized the merger recovery that was allowed, applied an appropriate discount rate, and concluded $208,644,237 of the AP is receiving *equivalent* rate base treatment. Consequently, the KCC required appropriate rate base adjustments to effectuate its stated intent of a 50-50 sharing of the merger savings.

The cash flow analysis of the KCC is entirely consistent with the methodology employed by the expert witness, James Proctor. We also note the financial records, books, and records of WRI and KGE disclose an AP of $800 million and an offsetting ADIT entry of $300 million. These entries are consistent with the KCC's reasoning and decision. Finally, there was admitted into evidence a company document (CURB exhibit 12) demonstrating that as a result of the merger savings recovered from the ratepayers, WRI and KGE are receiving a return on investment as well as a return of investment.

Accordingly, we conclude there is substantial evidence to support the findings and determination of the KCC, its order is not inconsistent with the 1991 and 1997 orders, and the order does not constitute an unlawful taking of property.

### Depreciation Rates for Coal-Fired Plants

WRI and KGE also contends the KCC erred in its determination of the appropriate depreciation rate for the companies' coal fired steam generating plants. WRI and KGE contend the KCC relied on unsound depreciation analyses and ordered depreciation rates that were so low they were confiscatory.

WRI and KGE own interests in a number of steam production facilities including but not limited to the Jeffrey Energy Center, LaCygne Energy Center, Lawrence Energy Center, and the Gordon Evans Energy Center. The parties fail to specify which plants are coal fired (versus fueled by natural gas or some other fuel). However, it appears the significant differences between the testimony of the experts were limited to these four facilities and the Wolf Creek nuclear power plant.

In determining the appropriate depreciation factor for these plants, recorded as an expense in calculating rate base, various witnesses testified, including James Aikman and Michael Majoros, Jr.

Aikman was an independent consultant specializing in depreciation issues retained by WRI and KGE to perform depreciation studies on their electric properties. Aikman testified his studies used a conventional straight line depreciation method over the service life of the properties and involved remaining life accrual rates. Aikman visited all of WRI and KGE's plants and had previously toured the Wolf Creek facility during an earlier depreciation study. Aikman testified the life span forecast method was the most appropriate method to determine the depreciation rates for electric generating plants. He also testified that dollars, rather than capital units, are the better measure for depreciation calculations.

Aikman testified depreciation accrual rates should reflect engineering judgment, recent industry and specific company experience, and current projections for the future. Aikman admitted these other factors were more subjective items and required judgment in estimating average service life. He also admitted that if a group of his peers engaged in his process of calculations, their conclusions might vary from each other 10 to 15 percent as to the annual depreciation amount.

Aikman considered the actual property history maintained by the companies in his analysis. However, he recognized that future life estimates cannot be made solely on past life experience. Judgment plays an important role in determining depreciation accrual rates.

With respect to the LaCygne 2 plant, Aikman recommended that KGE amortize the depreciation over the remaining life span of the

lease. In 2000, there were 17 years remaining on the lease. Aikman also assigned a 22-year remaining life for the Jeffrey Energy Center, 16 years of remaining life to the Lawrence Energy Center, and a 16-year remaining life to the Gordon Evans facility. Aikman admitted, however, that managers at WRI told him they had no current plans to retire any of the generation facilities at the time of his study and that if a plant stays on line longer than projected in a depreciation analysis, the accrual rate would drop.

Michael Majoros was an expert retained by CURB and several other intervenors. Majoros is vice president of an economic consulting firm that researches rates, revenues, and performance of regulated firms and industries. He has testified on numerous occasions before public utility regulatory commissions about depreciation issues. In preparing his proposals, Majoros and his team evaluated Aikman's testimony and exhibits, responses to various data requests, and independent calculations. Majoros also prepared a nationwide study of the lives of steam production units in excess of 50 MW. Majoros and/or an associate visited WRI's headquarters and toured the Jeffrey, Lawrence, and LaCygne plants.

Majoros conceded the alternative approach recommended by WRI in determining depreciation had intellectual merit; however, he did not recommend the other methodology. In his study, Majoros accepted Aikman's net salvage proposals and most of his life proposals based upon Majoros' independent analysis and judgment. However, Majoros strongly disagreed with Aikman's recommended life proposals for the Jeffrey, Lawrence, and LaCygne Energy Centers.

Majoros, like Aikman, used the life span method to determine the depreciation rate for production plant functions; this method is based on the premise that all plants within a property group will retire concurrently in a specific number of years after initial placement. Under this method, the projected final retirement date is the most important factor in determining depreciation. Majoros primarily criticized Aikman's retirement date calculations because, contrary to industry standards, Aikman did not review economic studies, company forecasts or retirement plans, or any studies about technological obsolescence, adequacy of capacity, or com-

petitive pressure. Although Aikman discussed these matters with management, he did not review or perform any independent studies dealing with these issues.

As part of his analysis, Majoros and his team updated a national study of steam generating units using a data base maintained by the United States Department of Energy. This study showed that steam generating units of 50 MW or greater were experiencing average life spans of 55 years and that these spans are lengthening almost yearly. This study does not support Aikman's 40-year and 45-year life spans for Jeffrey, Lawrence, and LaCygne Energy Centers.

Accordingly, Majoros and/or his associate visited these three facilities to determine whether there was any visible evidence to suggest these facilities would have shorter-than-average lives than the rest of WRI's units. Majoros observed that all the plants were well maintained and were receiving continued maintenance and upgrades. Majoros also reviewed a report prepared by the Kansas Electric Utilities Research Program (KEURP), which included both WRI and KGE. The KEURP report was generated during the 1980's and covered the Jeffrey and LaCygne plants. This report indicates that at the time it was compiled, the companies intended the plants to last longer than 40 years and that the companies had been in the process of extending the plants' lives since that time. According to Majoros, this supported a longer life span (60 years) than the national average (55 years).

Majoros noted that Aikman calculated a straight-line *remaining* life depreciation rather than a whole-life depreciation. According to Majoros, however, the method of calculation can be accurate only if the fundamental service life or net salvage value does not change during the life of the plant.

It appears the primary differences between Aikman's and Majoros' studies are that Aikman proposed a 40-year lifespan for the Jeffrey and LaCygne properties, while Majoros recommended 55 years. As to the Lawrence facility, Aikman admitted the planned operational life of units 3 through 5 of the plant were 50 or 60 years; however, Aikman's proposal shortened the life span for units

3 and 5 by 5 years and shortened the lifespan of unit 4 by 10 years. Aikman did not consider the KEURP study in his calculations.

WRI and KGE first argue there is not substantial competent evidence from the record as a whole to support the KCC's adoption of the depreciation rates proposed by Majoros. WRI and KGE argue there were fundamental flaws in Majoros' analysis and it did not provide a reliable basis for the KCC's decision.

In essence, WRI and KGE ask this court to reweigh the testimony of competing experts. Both Aikman and Majoros established their expertise in testifying about depreciation schedules and the KCC accepted both of them as experts. Here, the fundamental distinction was the life expectancy each expert assigned to WRI's and KGE's various facilities. Although the experts disagreed with the methodologies of each other, none of the evidence established that either expert's methodologies were professionally untenable.

The complex issues involving depreciation methodologies is clearly within the expertise of the KCC. When a court is reviewing a KCC decision for substantial evidence, the court must observe several limitations. This court may not substitute its judgment for that of the administrative agency. This is true even though there may be conflicting evidence which would support a contrary result. As noted by the Kansas Supreme Court:

" ' "Nothing can be gained by making a comparison of conflicting testimony. The commission is the trier of facts. The commission had the expertise through its staff to sift and evaluate . . . conflicting testimony." [Citation omitted.]' " *Mobil Exploration & Producing U.S. Inc. v. Kansas Corp. Comm'n,* 258 Kan. 796, 815, 908 P.2d 1276 (1995) (quoting *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n,* 244 Kan. 157, 166, 769 P.2d 1 [1989]).

As long as the record contains substantial competent evidence supporting the agency decision, the decision is reasonable and must be upheld. 258 Kan. at 809. See also *ABATE v. PSC,* 216 Mich. App. 8, 27, 548 N.W.2d 649 (1996) (Despite the existence of conflicting expert testimony, a decision by the Public Service Commission must be affirmed if it is supported by opinion testimony,

offered by a qualified expert who has a rational basis for his views, regardless of whether other experts disagree.).

Majoros' recommendations were based on national surveys and review of company records and facilities. He found no evidence to establish that any of the plants would be retired from service prior to the average life span of similar facilities. WRI and KPL never provided any evidence to either expert when, if ever, they planned to retire any of the facilities. While Aikman focused primarily on actual history of on-going investment and repairs of the facilities, he admitted past history was not a sole basis to judge remaining life of a facility. Aikman did not review information about technological obsolescence, competitive pressures, or company forecasts. Moreover, Aikman did not consider the KEURP study, generated in connection with WRI and KGE, proposing to prolong the life of its Jeffrey and LaCygne facilities. WRI and KGE do not refer to any testimony repudiating the proposals included in the KEURP study.

For the foregoing reasons, we conclude there is substantial competent evidence to support the KCC's acceptance of Majoros' study.

WRI and KGE also contend the KCC's findings as to depreciation are not supported by proper findings. They contend the KCC's evaluation of the competing studies was inadequate and the KCC improperly ignored criticisms of Majoros' study.

A review of the record on appeal strongly suggests this issue has not been preserved for appeal. K.S.A. 2001 Supp. 66-118b provides that a party seeking review of a KCC order must petition for reconsideration of the order in accordance with K.S.A. 2001 Supp. 77-529. A party may not rely upon any ground in a court proceeding that was not "set forth" in the petition for reconsideration. K.S.A. 2001 Supp. 66-118b. Under K.S.A. 2001 Supp. 77-529(a), the party must file a petition for reconsideration "stating the specific grounds upon which relief is requested." *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 222, 227-28, 943 P.2d 494 (1997), *aff'd in part and rev'd in part* 264 Kan. 363, 956 P.2d 685 (1998). Failure to exhaust administrative remedies generally is a bar to judicial review of agency action.

*Sandlin v. Roche Laboratories, Inc.*, 268 Kan. 79, 85-86, 991 P.2d 883 (1999). Whether a party is required to or has failed to exhaust required administrative remedies is a question of law over which appellate review is unlimited. 268 Kan. at 82.

It does not appear WRI and KGE challenged the adequacy (or lack thereof) of the KCC's findings of fact on the depreciation issue in their initial petition for reconsideration. At most, WRI and KGE asserted the reasons given for accepting Majoros' study was "not sufficient to support the Commission's ruling" and that the KCC "provided no proper basis for its decisions concerning deprecia-tion." These generic assertions were made in discussing all the claimed flaws of Majoros' study and all the "proper" features of Aikman's study. Consequently, WRI and KGE did not clearly ad-vise the KCC that its findings of fact were inadequate, and we may presume the KCC found all facts necessary to support its ruling. See *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998) (citing *Galindo v. City of Coffeyville*, 256 Kan. 455, 467, 885 P.2d 1246 [1994]).

Moreover, even if we were to consider the issue raised, we find no support for reversal. The KCC is not required to render its findings of fact in minute detail. The findings must be specific enough to allow judicial review of the reasonableness of the order. *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 475, 749 P.2d 21 (1988). However, findings by the KCC do not have to be stated with such particularity as to amount to a summation of all the evidence. *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d 525, 535, 685 P.2d 304, *rev. denied* 236 Kan. 875 (1984). The KCC is not generally required to explain why it did not accept every piece of evidence presented. *Southwest Kan. Royalty Owners Ass'n v. Kansas Corp. Comm'n*, 244 Kan. at 190. Moreover, an agency's findings will be upheld, " 'though of less than ideal clarity, if the agency's path may reasonably be dis-cerned.' " *Williston Basin Inter. Pipeline Co. v. F.E.R.C.*, 165 F.3d 54, 65 (D.C. Cir. 1999) (quoting *Greater Boston Television Cor-poration v. F.C.C.*, 444 F.2d 841, 851 [D.C. Cir. 1970]).

The practical question before the KCC was to determine which of two experts' reports was more reasonable in determining the

useful life of production facilities; there was ample evidence in the record to support an adoption of either expert's analysis. *Cf. Zinke & Trumbo, Ltd.*, 242 Kan. at 489-91 (the KCC's unexplained determination a gas field is a common source of supply, when all the evidence in the record was to the contrary, was error in the absence of sufficient findings of fact to support the determination). We conclude more detailed findings explaining why the KCC accepted Majoros' study would not be of substantial assistance to this court in discharging its obligation of appellate review.

Finally, WRI and KGE specifically attack the life span Majoros recommended and the KCC adopted with respect to the LaCygne facility. Aikman testified the useful life should be based on the length of KGE's lease of the facility, which would expire in 2017. However, Majoros determined KGE's interest in LaCygne should expire based on the useful life of the facility, which he estimated to run until 2030. WRI and KGE contend this rate is so low as to be confiscatory.

WRI and KGE argue that because KGE's lease of the facility ends in 2017, it is arbitrary and capricious to set a depreciation rate for a time period well beyond the life of the lease. As noted above, however, the sale/leaseback agreement presented to the KCC in 1987 indicated that at the end of the lease, KGE had the option to renew the lease or purchase the LaCygne plant back at fair market value. Therefore, the companies' claim their interest automatically terminates at the end of the lease is not supported by the record. There was no evidence cited which reflected that KGE would not seek to renew its lease or to buy back the facility in 2017. Moreover, the KCC clearly indicated in 1987 when it approved the lease that the transaction was clearly a financing mechanism and not an outright sale. For these reasons, the KCC's decision was not arbitrary or capricious.

### Depreciation Rate—Wolf Creek

WRI and KGE also dispute the KCC's decision as to the appropriate depreciation rate to be allocated to the Wolf Creek nuclear power plant. The KCC adopted a depreciation rate which assumed Wolf Creek's owners would apply for and obtain a 20-year exten-

sion of their operating license. WRI and KGE contend this determination is speculative, unreasonable, and unlawful. WRI and KGE also argue the rate is discriminatory as compared to other co-owners of Wolf Creek.

Aikman and Majoros were the primary witnesses on this depreciation issue. Aikman recommended that depreciation for Wolf Creek be amortized over the "licensed life" of the plant; because the present license expires in 2025, Aikman recommended a 25-year amortization for existing capital expenditures made in year 2000. Aikman proposed an accrual rate for Wolf Creek of 2.81% based on this life span. Aikman testified that there is no assurance that any application for an extension of Wolf Creek's license would be granted. Aikman also cited the fact that several nuclear units have been decommissioned prior to the expiration of their license and the prevailing public attitudes toward nuclear facilities; he admitted later, however, that several of the decommissioned plants were prototypes unlike Wolf Creek.

Like Aikman, Majoros used a life span method in determining the appropriate depreciation rate for Wolf Creek. The primary issue, according to Majoros, was whether the life span should reflect an assumption of a 20-year extension to Wolf Creek's operating license. In his evaluation of Wolf Creek, Majoros visited the Nuclear Regulatory Commission (NRC) to investigate the status of operating license extensions. Majoros noted that five units at two different nuclear plants have been granted 20-year extensions by the NRC recently. Five other units at three plants have applied for extensions and 28 more units at 17 plants are expected by the NRC to apply for license extensions by 2004. Based upon the 20-year license extension, Majoros recommended an accrual rate of 2.36%.

While Majoros conceded Wolf Creek was not able to apply for an extension until 2005, he fully expected the company to apply for an extension; there was evidence of statements from Wolf Creek's manager of the intent to seek an extension. Majoros also noted Wolf Creek has received good ratings in all phases of recent NRC inspections and had been extremely reliable in recent years. Moreover, the NRC has instituted streamlined application procedures.

Majoros noted that in a recent Maryland rate case, 20-year extensions were granted to two units of a nuclear plant owned by Baltimore Gas & Electric within 2 years of Aikman's testimony that the extension should not be presumed in the company's depreciation calculations. In this situation, if the extensions are not factored into depreciation rates, the facilities become vastly over-depreciated. WRI's current depreciation rates are too high, resulting in the assets being over-depreciated while at the same time the company is collecting rates for estimated decommissioning.

In rebuttal, Aikman testified that other experts' projections that Wolf Creek's operating license would be extended was "wildly speculative." He noted Wolf Creek may not even apply for an extension until 2005. However, Aikman admitted he had not talked with the management at Wolf Creek about the potential for a license extension. The KCC admitted into evidence a newspaper article where a top management official at Wolf Creek stated he perceived no problems in getting an extension of its operating license.

WRI and KGE argue that because Wolf Creek cannot apply for an extension of its license until 2005, it is speculative and arbitrary for the KCC to base the depreciation rates for the plants on the assumption Wolf Creek would apply for and receive such an extension.

This issue comes down to whether there was a reasonable and rational basis to determine Wolf Creek's life span was likely to extend beyond the expiration of its initial operating license in 2025. Both experts agreed that life span analysis was the appropriate method for determining the depreciation rate and that the forecasted life span of a electrical facility calls for the exercise of considerable judgment based on a number of factors.

Here, the KCC found the testimony of Majoros, who predicted a 20-year license extension for Wolf Creek, more persuasive than that of Aikman. The record reflects that Majoros considered Wolf Creek's good operating record and public statements from its management that it would seek the extension and were hopeful it would be granted. Majoros also noted the NRC's streamlined application

process for extensions and its license extensions for well-run nuclear plants.

Setting depreciation rates requires the KCC to forecast the actual useful life of a generating facility. By definition, such a decision inherently involves projections, not certitude. In our opinion, the KCC's special expertise must be given deference by this court. We conclude there exists substantial competent evidence in the record to support the KCC's determination.

WRI and KGE also argue additionally that the depreciation rate for Wolf Creek was unduly discriminatory and arbitrary because other utilities owning a share of Wolf Creek have received significantly different depreciation rates through the KCC.

Kansas City Power & Light (KCPL) owns the same percentage of the Wolf Creek facility as does KGE. In a rate order issued in January 1998 in Docket No. 97-KCPE-661-RTS, the KCC set KCPL's depreciation rate for the Wolf Creek facility at 3.09%. Majoros' depreciation rate for Wolf Creek, adopted by the KCC, was 1.73%.

The KCPL rate proceeding cited was resolved through an amended settlement agreement among KCPL, the KCC Staff, and CURB. One of the settled issues permitted KCPL to set a depreciation rate for Wolf Creek at 3.09%. The order also provided for a $14.2 million annual rate decrease by KCPL. However, the order clearly reflects that the KCC anticipated KCPL rates would be revisited in the anticipated KCPL and WRI merger. This merger, of course, never occurred.

WRI and KGE have not provided authority which requires the co-owners of a facility to receive the same depreciation rate for co-owned property. The KCC explained that prior to its present order, KCPL and KGE did not have identical rates. Moreover, WRI and KGE's rate case is obviously much closer in time to when Wolf Creek can apply for a license extension.

Absent any authority requiring the KCC to impose the same depreciation rate for co-owners whose rate cases occur at significantly different times, we are not in a position to question the expertise of the KCC. We conclude there is substantial competent

evidence in the record to support the KCC's decision upon this issue.

## Conclusion

We conclude the KCC did not erroneously interpret or apply the law; its final order is not unreasonable, arbitrary, or capricious; and the underlying findings are supported by substantial competent evidence. Accordingly, the decision of the KCC will not be disturbed.

Affirmed.